**PENELLO v. INTERNATIONAL UNION, UNITED MINE WORKERS OF AMERICA et al.**

Civ. A. No. 275–50.

United States District Court
District of Columbia.

Feb. 9, 1950.

Robert N. Denham, General Counsel, N.L.R.B., Winthrop A. Johns, Assistant General Counsel, Dominick L. Manoli, Washington, D. C., Sidney J. Barban, Baltimore, Md., for petitioner.

Welly K. Hopkins, Harrison Combs, Washington, D. C., Willard P. Owens, Washington, D. C., M. E. Boiarsky, Charleston, W.Va., for respondents.

KEECH, District Judge.

This case is before the court on the complaint of the Regional Director of the Fifth Region of the National Labor Relations Board, on behalf of the Board, for appropriate injunctive relief, pursuant to Section 10(j) of the National Labor Relations Act, as amended, 29 U.S.C.A. § 160(j), pending final adjudication of the Board with respect to certain complaints charging the respondents, International Union, United Mine Workers of America, and its agent John L. Lewis, with unfair labor practices in violation of Sections 8(b)(2) and 8(b) (3) of the Act, 29 U.S.C.A. § 158 (b) (2, 3).

■ The first defense raised by respondents is that the court has no jurisdiction over the subject matter or the parties, because Section 10(j) of the National Labor Relations Act, as amended, is unconstitutional and void as repugnant to Article III, Sections 1 and 2, and the Fifth Amendment to the Constitution of the United States. This point was not argued by counsel at any length, doubtless for the reason that the Act has been sustained heretofore in a number of cases, including a previous decision by this court.[1] As so dealt with by the respondents, the apparent purpose of counsel was to preserve the point for possible further action.

■ The same can be said of the second defense, namely, that the petitioner has no right to bring this action because Section 10(j) of the Act provides that such action shall be brought by "the Board," and that the National Labor Relations Board has no authority under the Act or any other provision of law to delegate such power to the local Regional Director. Such delegation has been determined to be lawful.[2]

Respondents' third, fourth, and fifth defenses may be dealt with together. They allege that the petition and order to show cause herein do not state a claim upon which the relief prayed can or should be granted, and that the facts alleged in the petition do not show that there is reasonable cause to believe that respondents have engaged in unfair labor practices within the meaning of either Section 8(b)(2) or Section 8(b)(3).

The injunction here sought is under statutory provisions enacted by the Congress, and not under the common law. Hence, for guidance the court must look to the act in question and the legislative history, as well as determinations by other tribunals.

Section 1(b) of the Labor Management Relations Act, 29 U.S.C.A. § 141(b), provides:

"Industrial strife which interferes with the normal flow of commerce and with the full production of articles and commodities for commerce, can be avoided or substantially minimized if employers, employees, and labor organizations each recognize under law one another's legitimate rights in their relations with each other, and above all recognize under law that neither party has any right in its relations with any other to engage in acts or practices which jeopardize the public health, safety, or interest.

"It is the purpose and policy of this Act, in order to promote the full flow of commerce, to prescribe the legitimate rights of both employees and employers in their relations affecting commerce, to provide orderly and peaceful procedures for preventing the interference by either with the legitimate rights of the other, to protect the rights of individual employees in their relations with labor organizations whose activities affect commerce, to define and proscribe practices on the part of labor and management which affect commerce and are inimical to the general welfare, and to protect the rights of the public in connection with labor disputes affecting commerce."

■ The philosophy of the Act is twofold, first that the legitimate rights of labor and management shall be recognized, and second—and equally important—that neith-

1. Evans v. International Typographical Union, D.C., 76 F.Supp. 881; Madden v. International Union, United Mine Workers of America, D.C., 79 F.Supp. 616; Douds v. Local 294, International Brotherhood of Teamsters, D.C., 75 F.Supp. 414.

2. Evans v. International Typographical Union, supra.

er labor nor management has the right to engage in any practice which will jeopardize the public health, safety, or interest, or which will obstruct the flow of commerce.

To these ends, the Act imposes on both management and labor the duty to bargain collectively, Sec. 8(a)(5) and Sec. 8(b)(3), which is defined by the Act, Sec. 8(d), as "the mutual obligation of the employer and the representative of the employees to meet at reasonable times and confer in good faith with respect to wages, hours, and other terms and conditions of employment, or the negotiation of an agreement, or any question arising thereunder, and the execution of a written contract incorporating any agreement reached if requested by either party". The Supreme Court has stated, speaking of the duty imposed upon employers by the National Labor Relations Act prior to its amendment and now, under the amended Act, applicable to both employers and labor organizations, National Labor Relations Board v. Sands Mfg. Co., 306 U.S. 332, 342, 59 S.Ct. 508, 513, 83 L.Ed. 682: "The legislative history of the Act goes far to indicate that the purpose of the statute was to compel employers to bargain collectively with their employes to the end that employment contracts *binding on both parties* should be made." (Emphasis supplied.)

Refusal of an employee to bargain collectively is made an unfair labor practice under the Act, Sec. 8(b)(3). Sections 10(b) and (c) provide for issuance of a complaint by the Board when any person is charged with engaging in such unfair labor practice, for determination by the Board of the truth of such charges, and for issuance by the Board of an order requiring any person found to have engaged or be engaging in such unfair labor practice to desist therefrom. Section 10(j) permits the Board to petition the appropriate district court of the United States for temporary injunctive relief pending its adjudication of an unfair labor practice complaint.

Section 10(j) clearly vests this court with the right to hear and determine controversies such as the one here involved.

Bearing in mind that it is the duty of the court to administer the law as written and not to pass upon the wisdom of its provisions, this court must determine, first, whether the acts charged, as a matter of law, come within the practices defined by the Congress as unfair, specifically, Sec. 8(b)(2) and 8(b)(3), and second, whether the record before the court shows a reasonable probability—the degree of proof requisite to the injunctive relief here sought[3] —of the existence of facts showing such unfair labor practices were or are being committed. If both of these propositions are answered in the affirmative as to any one or more of the charges, then the court has authority under Section 10(j) of the Act to grant such injunctive relief as it deems just and proper.

The unfair labor practices on the part of respondents here complained of are:

(1) Refusing to bargain collectively in good faith by insisting that any collective bargaining agreement with the employers provide, as a condition of employment, for a closed shop without compliance by the union with the statutory requirements, Sec. 8(a)(3), prerequisite to every closed shop agreement;

(2) By insisting that any collective bargaining agreement with the employers contain a so-called welfare and retirement fund to be administered so as to provide benefits therefrom for members of the respondent union only;

(3) By insisting that any collective bargaining agreement with the employers contain such provisions as the so-called "able and willing" and "memorial period" clauses contained in prior agreements between the parties, which are designed and intended by respondents to permit them unilaterally to abrogate or suspend the operation of such contract at any time, and to permit respondents unilaterally to determine the period or periods when members of the respondent union shall work, or fix the terms and conditions of employment as respondents may see fit, so that the agreement would in reality not be binding upon the respondent union or its members; and

---

**3.** Evans v. International Typographical Union, supra.

(4) By refusing and failing to accede to the request of the Southern Coal Producers Association for further collective bargaining conferences.

■ As to the first practice, there is no doubt in the court's mind that insistence by the respondents on inclusion in the wage contract of a closed shop provision without their compliance with the statutory provisions set up by the Congress as a condition precedent to execution of closed shop agreements, is an unfair labor practice under Sections 8 (b)(2) and (3); and, further, the court entertains no doubt but that the record in this case goes beyond the degree of proof required.

■ As to the second practice, it is the opinion of the court that insistence that the welfare and retirement fund be administered so as to limit the benefits thereunder to union members and their dependents without compliance with the statutory requirements for a closed shop agreement, is in conflict with Section 8 (b)(2) and (3) of the Act. The record supports the probability of this unfair labor practice.

We come next to determination of whether the third unfair labor practice charged, insistence that any collective bargaining agreement include the so-called "able and willing" and "memorial period" clauses of former contracts, is a violation under the terms of Section 8(b)(3) of the Act.

Section 8(b)(3) provides: "It shall be an unfair labor practice for a labor organization * * * to refuse to bargain collectively with an employer * * *."

■ Section 8(d) of the Act defines the phrase "to bargain collectively" for the purposes of Section 8, "Unfair labor practices," as—"performance of the mutual obligation of the employer and the representative of the employees to meet at reasonable times and confer *in good faith* with respect to *wages, hours, and other terms and conditions of employment,* or the negotiation of an agreement, or any question arising thereunder, and the execution of a written contract incorporating any agreement reached if requested by either party * *." Collective bargaining under the Act therefore has two essential elements: (1) con-

ferring with respect to wages, hours, and other terms and conditions of employment, and (2) that such conferring shall be done in good faith.

■ As to the first, the subject matter of the bargain, the Supreme Court stated in J. I. Case Co. v. National Labor Relations Board, 321 U.S. 332, 334, 64 S.Ct. 576, 579, 88 L.Ed. 762: "Collective bargaining between employer and the representatives of a unit, usually a union, results in an accord as to terms which will govern hiring and work and pay in that unit. The result is not, however, a contract of employment except in rare cases; no one has a job by reason of it and no obligation to any individual ordinarily comes into existence from it alone. The negotiations between union and management result in what often has been called a trade agreement, rather than in a contract of employment. Without pushing the analogy too far, the agreement may be likened to the tariffs established by a carrier, to standard provisions prescribed by supervising authorities for insurance policies, or to utility schedules of rates and rules for service * * *."

The provisions of the 1947 and 1948 National Bituminous Coal Wage Agreements which it is alleged the union has insisted be carried over into any future contract are: "It is the intent and purpose of the parties hereto that this agreement * * * shall cover the employment of persons employed in the bituminous coal mines covered by this Agreement during such time as such persons are *able and willing to work,*" and "The International Union, United Mine Workers of America may designate memorial periods provided it shall give proper notice to each district."

On its face, neither of these provisions would seem to add to the rights of the union or its members, since the coal wage agreement is not a contract of employment in the sense of an agreement by management to employ for any specific term or an agreement by labor to work for any specific term, and since the agreement further provides that any "no strike" or "penalty" or "illegal suspension of work" clauses in earlier contracts are rescinded and made null and void. The 1947 and 1948 coal wage agreements

therefore in no way obligated employees to work when they were "unwilling" or "unable" even omitting the controversial provisions (save as to bringing into play Sec. 8(d) of the Act).

However, as interpreted by the respondent Lewis the "able and willing" and "memorial period" clauses constitute an entirely different proposition. The reason for insistence upon the provisions in question (to all intents and purposes openly stated by respondent Lewis) is to control production and ultimately, through such control, at least indirectly, to fix prices.

The record herein shows that the respondent Lewis, on or about October 7, 1948, made a statement to the Union Convention at Cincinnati, Ohio, in which he said: "When this market condition comes to a point in the bituminous industry that it threatens the stability of our contract and the working conditions of our people, when the disparity of employment gets to the point where it constitutes a rank injustice and lack of opportunity for our members to work, the United Mine Workers of America itself may find it necessary to advise our members how many days a week they need to work. *We have that contractual right, because the contracts are written to permit that.* It is a matter of self-preservation for our mine workers; it is a matter of self-preservation for the investors in the industry. If the operators of this country can't give any leadership on the commercial side of this industry, the United Mine Workers of America can and will."

On June 8, 1949, the Union, through its President, the respondent Lewis, ordered a "cessation of work" in all bituminous coal mines for the period June 13 to June 20, 1949. The notice of such "cessation" provided:

"United Mine Workers of America
"United Mine Workers Building
"Washington, D. C.
"June 8, 1949

"To Each Officer and Member of All Local Unions in All Districts of the United Mine Workers of America in the United States:

"Greetings:

"The magnificent production efforts of the Mine Workers during the current year have created menacing instability in the mining industry. Results are apparent in more than adequate tonnage for the domestic and export market; irregular and broken working time affecting some hundreds of thousands of men while other mines work steadily; economic inequities affecting the Mine Workers; and a general condition of instability throughout the whole industry. Inescapably, continuation of this folly will eventuate in irreparable damage to our basic industry and the national economy.

"United Mine Workers of America and its members, conscious of their industry and public responsibilities, are unwilling further to jeopardize the security of the industry, the mine workers employed therein, and the collective bargaining structure, without which confusion and chaos would exist. The Mine Workers are required again to protect affirmatively the human and property values inherent in the coal mining industry.

"Exercising, therefore, *its contractual options* under the agreements in all Anthracite and Bituminous Districts the United Mine Workers of America is hereby authorizing a brief Stabilizing Period of Inaction, during which a cessation of all mining will occur. No work other than that essential to the protection of human life and property is authorized during this period. A cessation of mining will be effective Monday, June 13, and work will be resumed on Monday, June 20. This period of inaction will emphasize a lack of general stability in the industry and the dangers which will accrue therefrom if current harmful practices are not remedied. It will contribute constructively to the abatement of current economic demoralization; it will not adversely affect the public interests; it will help preserve property values in the industry; and it will help preserve the living standards of the United Mine Workers, their dependents, and the communities which depend upon the Mine Workers' income.

"The cooperation of all members with this policy is requested.

"John L. Lewis, President
"Thomas Kennedy, Vice-President
"John Owens, Secretary-Treasurer"

As interpreted by the respondents, the "able and willing" and "memorial period" clauses accomplish a circumvention of Section 8 (d)(4) of the National Labor Relations Act, which provides: " * * * where there is in effect a collective-bargaining contract covering employees in an industry affecting commerce, the duty to bargain collectively shall also mean that no party to such contract shall terminate or modify such contract, unless the party desiring such termination or modification * * * (4) continues in full force and effect, without resorting to strike or lockout, all the terms and conditions of the existing contract for a period of sixty days after such notice is given or until the expiration date of such contract whichever occurs later".

Good faith does not permit such extraneous and unlawful provisions to be insisted upon by an employee group as a condition of a wage agreement. To include such provisions would be tantamount to nullifying any agreement reached at its birth, and thus to defeat the purpose of the Act to accelerate and lessen interruption of the free flow in commerce of commodities vital to the nation's welfare. Furthermore, the inclusion of such provisions would be contra to the intent of the Congress that where such an agreement is reached termination or modification thereof or strikes thereunder shall occur in the manner set forth in the Act. The machinery of Section 8(d) prevents precipitous ending of an agreement made in good faith and strikes or lock-outs without notice, with consequent dire results to the parties and the public.

This is not a question of individual workers seeking to avail themselves of their constitutional right to be free to work when they desire. The insistence here is for provisions which have been interpreted by a union as authorizing it and its representatives, at the whim of its leaders, without limitation, to order its members collectively to refrain from work and paralyze an industry vital to the economy of the nation.

That the Congress recognizes a distinction between the right to deal with the concerted action on the part of labor, through labor organizations and their agents, and the individual employee of an employer, is clearly spelt out by comparison of the language of Section 8(b) and (d) relating to unfair labor practices of "a labor organization or its agents" and limiting their right to strike, and Section 502, 29 U.S.C.A. § 143, the "Saving Provision." The latter section specifically immunizes an individual employee from having to render labor or service without his consent, declares that the quitting of his labor by an individual employee shall not be illegal, and prohibits issuance of process to compel such labor or service without his consent.

The fact that previous contracts have heretofore embraced such provisions is not controlling, even if they were entered into freely. Neither party has the right to include in a wage agreement provisions contrary to law.

As the National Labor Relations Board said in National Maritime Union of America, 78 N.L.R.B. 971, sustained, N.L.R.B. v. National Maritime Union of America, 2 Cir., 175 F.2d 686, 689: "But what the Act does not permit is the insistence, as a condition precedent to entering into a collective bargaining agreement, that the other party to the negotiations agree to a provision or take some action which is unlawful or inconsistent with the basic policy of the Act. Compliance with the Act's requirement of collective bargaining cannot be made dependent upon the acceptance of provisions in the agreement, which by their terms or in their effectuation, are repugnant to the Act's specific language or basic policy."

Should the operators, through concerted action, agree to such provisions with knowledge that they are to be used in the sense given them by the respondents, the question might well arise as to whether a conspiracy in restraint of trade is in the making; and further, if action were taken under such agreement toward limiting production for the purpose of fixing prices, whether

such action might not be in violation of the anti-trust laws.

The court concludes that insistence upon inclusion of the so-called "able and willing" and "memorial period" clauses in the negotiation of an agreement is a refusal to confer in good faith, and therefore a practice condemned by Section 8(b)(3). By finding lack of good faith in such insistence I do not mean that it is done with "evil purpose", but merely that it is an insistence on inclusion of provisions without the scope of proper negotiation between the parties which may constitute a bar to effecting an accord.

The court further concludes that the record supports the probability that the respondents did insist on inclusion of the "able and willing" and "memorial period" clauses in any new wage agreement.

 The last of the unfair labor practices with which respondents are charged is refusal to answer the request of the Southern Coal Producers Association for a collective bargaining conference. Such action would be in direct violation of Section 8 (b)(3), and the record supports the probability of such violation.

Respondents' sixth defense alleges that "since each of the alleged activities of the Respondents of which complaint is made in the petition filed herein and upon which Petitioner predicates his claims for temporary relief is wholly beyond the power, authority and jurisdiction of the Board, the relief sought in said petition and as prayed for therein is beyond the power, authority and jurisdiction of the Court to grant." The court, having determined that the practices complained of are unfair labor practices within the meaning of Sections 8 (b) (2) and 8 (b)(3), finds this contention without merit.

 We proceed then to the question of appropriate injunctive relief.

It is important to note that the question here involved, entirely apart from the interest of the parties to the labor-management dispute from which the case arose, is of prime importance to the entire nation. It is not necessary to point out that coal is a matter of vital concern to the whole economy of the United States. It has now been recognized that the failure of labor and management in the coal industry to get together and to produce an adequate amount of coal has imperiled the welfare of the nation.[4] It should be noted further that the petitioner here is not one of the parties to the labor-management dispute, but is a representative of the Government of the United States, acting to protect the rights of the public.

The mere fact that the injunctive relief requested is not that commonly recognized at common law, but is statutory, does not render the relief sought illegal. In N.L.R.B. v. Colten, 105 F.2d 179, 182, the Circuit Court of Appeals for the Sixth Circuit said of National Labor Relations Board orders, "They are to implement a public social or economic policy not primarily concerned with private rights, and through remedies not only unknown to the common law but often in derogation of it." The same is applicable to injunctive relief under the Labor Management Relations Act, 29 U.S.C.A. § 141 et seq.

The court is clearly conscious of the fact that a finding that the record supports the conclusion that there is reasonable probability that the respondents have engaged in unfair labor practices proscribed by the letter, intent, and purpose of the Labor Management Relations Act of 1947 and that an injunction should issue, will not necessarily make for a rapid and amicable negotiation of an agreement, even if the respondents, in the light of this memorandum, abandon their request, insistence, or demand for inclusion of the provisions here complained of. This, at least, can be said: that a conscientious endeavor on the part of the parties can quickly disclose what the true difference or differences between them are, and that concentration on such differences will offer far stronger probability that an accord may be reached.

4. Statement of Dr. James Boyd, Director of U. S. Bureau of Mines, before Senate Committee on Labor and Public Welfare on Jan. 25, 1950.

Significant at this point is the language of the Circuit Court of Appeals for the Fourth Circuit in the case of Jeffery-De Witt Insulator Co. v. N.L.R.B., 91 F.2d 134, 139, 112 A.L.R. 948: "It is true that the act does not require the parties to agree but merely to negotiate with each other; but it is based upon the idea that negotiations honestly entered into will generally result in the settlement of differences, and commands negotiation for that reason."

Under the circumstances of this case, the court believes petitioner entitled to the injunctive relief prayed. Counsel will prepare appropriate findings of fact, conclusions of law, and order.