**JAFFEE v. NEWSPAPER & MAIL DELIV-
ERERS' UNION OF NEW YORK
& VICINITY.**

United States District Court
S. D. New York.
April 10, 1951.

George J. Bott, General Counsel, David
P. Findling, Associate General Counsel,
Winthrop A. Johns, Assistant General
Counsel, Washington, D. C., Helen F.

Humphrey, Chief Law Officer, New York City, James F. Foley, Washington, D. C., Samuel M. Kaynard, New York City, Attys., National Labor Relations Board, for petitioner.

Samuel Duker, New York City, for respondent.

LEIBELL, District Judge.

This proceeding was instituted on March 1, 1951 by the filing of a petition for an injunction under § 10(j) of the National Labor Relations Act, as amended, Title 29 U.S.C.A. § 160(j). Judge S. H. Kaufman signed an order requiring the respondent union to show cause "why it should not be enjoined and restrained as prayed in said petition". The prayer of the petitioner was that the "respondent [union] its agents, servants, employees, attorneys, and all persons in active concert or participation with it" be enjoined and restrained "from violating Section 8(b) subsection (2) of the Act, in any manner by causing or attempting to cause the Times, Mirror, News, Herald Tribune, Journal-American, or any other newspaper in New York or vicinity to discriminate in any manner against employees in violation of Section 8(a), subsection (3) of the Act."

The respondent filed its answer on March 8th and the Court held hearings on March 12, 13, 14, 15, 16, 19, 20, 21, 22 and 27, 1951, at which proof was received through the testimony of witnesses and exhibits offered by the petitioner and respondent. On March 27th counsel summed up and made their final arguments. Proposed findings were thereafter submitted.

Section 10(j) of the National Labor Relations Act, of June 23, 1947 provides: "(j) The Board shall have power, upon issuance of a complaint as provided in subsection (b) of this section charging that any person has engaged in or is engaging in an unfair labor practice, to petition any district court of the United States (including the District Court of the United States for the District of Columbia), within any district wherein the unfair labor practice in question is alleged to have occurred or wherein such person resides or transacts business, for appropriate temporary relief or restraining order. Upon the filing of any such petition the court shall cause notice thereof to be served upon such person, and thereupon shall have jurisdiction to grant to the Board such temporary relief or restraining order as it deems just and proper."

Complaints have been issued by the National Labor Relations Board under Section 10(b), T. 29 U.S.C.A. § 160(b), against the respondent union charging that the union by work stoppages and threats had compelled the publishers of five newspapers, whose plants are located in New York City, to discriminate against non-union men, in the hiring of employees who deliver the newspapers from the printing plants to newsdealers and railroad stations. The complaints issued by the Board charged that the conduct of the union constituted unfair labor practices and was a violation of Section 8(b)(2) of the Act, T. 29 U.S.C.A. § 158(b)(2), which provides:—

"(b) It shall be an unfair labor practice for a labor organization or its agents—
* * * * * *

"(2) to cause or attempt to cause an employer to discriminate against an employee in violation of subsection (a)(3) of this section or to discriminate against an employee with respect to whom membership in such organization has been denied or terminated on some ground other than his failure to tender the periodic dues and the initiation fees uniformly required as a condition of acquiring or retaining membership".

Subsection (a)(3) of Section 8 of the Act, which is Section 158 of Title 29 U.S.C.A. provides:—

"(a) It shall be an unfair labor practice for an employer—
* * * * * *

"(3) by discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization: Provided, That nothing in this subchapter, or in any other statute of the United States, shall preclude an employer from making an agreement with a labor

organization (not established, maintained, or assisted by any action defined in section 158(a) of this title as an unfair labor practice) to require as a condition of employment membership therein on or after the thirtieth day following the beginning of such employment or the effective date of such agreement, whichever is the later, (i) if such labor organization is the representative of the employees as provided in section 159(a) of this title, in the appropriate collective-bargaining unit covered by such agreement when made; and (ii) if, following the most recent election held as provided in section 159(e) of this title the Board shall have certified that at least a majority of the employees eligible to vote in such election have voted to authorize such labor organization to make such an agreement: *Provided further,* That no employer shall justify any discrimination against an employee for nonmembership in a labor organization (a) if he has reasonable grounds for believing that such membership was not available to the employee on the same terms and conditions generally applicable to other members, or (B) if he has reasonable grounds for believing that membership was denied or terminated for reasons other than the failure of the employee to tender the periodic dues and the initiation fees uniformly required as a condition of acquiring or retaining membership;"

This last quoted provision, subsection (a)(3), is the so-called "union shop" provision. It was impossible for any non-union employee in the delivery division of these newspapers to become a member of the respondent union because of the "father and son" provisions of its constitution. Respondent is in effect a "closed union". A resolution to accord the non-union men a limited form of membership, involving a probationary period of two years, was rejected by the executive committee of the union by a vote of 6-4 and was tabled by the union membership at the suggestion of its president in September 1950.

Prior to the passage of the Taft-Hartley Act, enacted June 23, 1947, the contract between the publishers (acting through a Publishers Association) and the News-papers Deliverers Union provided for a "closed shop" at the various newspaper plants. The last contract negotiated on that basis was for the period of July 17, 1945 to July 16, 1948. The Act did not affect existing collective bargaining agreements, but it did apply to future relations between the union and the employer, after the expiration of the agreements.

The Newspapers Publishers Association and the Newspapers Deliverers Union started negotiations for a new contract some time prior to July 1948 but at the expiration date of the old contract (July 17, 1948) no new contract had been concluded.

Under the old contract the publishers had agreed not to hire non-union men if the Union was able to furnish union members willing and qualified to do the work. Because of the need for men in addition to the "regular situation holders" and the "regular substitutes" it had been the practice to have union and non-union men "shape up" at certain hiring hours at the newspaper plants or garages. The men who shaped up were known as "extras". The union men in the "shape up" were hired first and then the non-union men. On many nights, especially on Fridays and Saturdays when sections of the Sunday editions were delivered to newsdealers, more men than the union could supply were required to handle the bundled newspapers and place them in trucks and deliver them to newsdealers and railroad stations. These non-union men could not become members of the union even if they wanted to. The priority given to sons of members and the purpose of the union to limit its membership, kept the available number of union men usually less than the number required by the publishers for the delivery of the newspapers. Thus certain non-union men would shape up with regularity at the hiring hours during the week and others would appear for work on Fridays and Saturdays. This was the practice while the closed-shop provisions were in effect in the old collective bargaining contracts, the last of which expired July 17, 1948.

Since that date, regardless of the provisions of its later contracts with the publishers, the union has through threats of strikes and work stoppages caused the newspaper-publishers to give the preference in hiring to union members over non-union workers regardless of seniority and to limit the employment of non-union workers only to such times as union members were not available for hiring.

The order of seniority of employees had been one of plant seniority. There had been more than enough jobs available and no question of any so-called industry wide seniority had arisen. But in 1949 a newspaper known as the "Star" and a newspaper delivery corporation known as the "Interboro News Company" went out of business. The respondent union had a collective bargaining agreement with those two companies and a number of union men lost their jobs.

The union officials were faced with the problem of finding new jobs for these men. They were sent to the plants of other newspapers and the union demanded that they be given employment in seniority immediately following the union men already working at the plant. In this way they displaced non-union men in the "shape up", and the union adhered to its demands that no non-union man be employed so long as there was a union man available for work.

A similar situation, only worse, developed when the New York Sun stopped publishing early in January 1950. "Union men first" was the slogan and regardless of the seniority of non-union men at the various newspaper plants, the union had its way and the publishers were compelled to yield to its demands and to violate the Taft-Hartley Act by discriminating against the non-union men in hiring employees. The alternative was to close down the plants. This led to the filing of charges of discrimination by non-union men who thus took their complaints to the National Labor Relations Board. After investigation, the Board issued formal complaints against various publishers in some of which the union was also named as a respondent.

Annexed to the petition in this proceeding are the following exhibits:—

1. A complaint issued by the Board in August 1950 against The New York Times Company, Inc. and the Newspaper and Mail Deliverers' Union of New York and Vicinity based upon charges filed with the Board by twelve non-union employees. Copies of the charges against the Times and the union, dated October 1948 are annexed to the complaint.

2. A complaint issued by the Board August 24, 1950 against the Hearst Corporation, New York Mirror Department and against the union based upon charges filed with the Board by eight non-union employees in 1948 and 1950. Copies of the charges are annexed to the complaint.

3. A complaint issued by the Board against the News Syndicate Co. Inc. (publishers of the New York Daily News) and the union on August 25, 1950 based upon charges filed with the Board by one non-union employee in October 1949 and by twelve non-union employees in January 1950. Copies of the charges are annexed to the complaint.

4. A complaint issued by the Board on July 27, 1949 against the New York Tribune Inc. (publisher of the New York Herald-Tribune) and the union, based on charges filed with the Board in October 1948 by seven non-union employees. Copies of the charges are annexed to the complaint.

5. A complaint issued by the Board against the Hearst Consolidated Publications, Inc. (publisher of the New York Journal-American) and the union on July 29, 1949 based on charges filed by nine non-union employees. Copies of the charges dated January and May 1949 are annexed to the complaint.

The Times consented to a cease and desist order (which was issued by the Board on January 10, 1951) against discriminating in regard to hire and tenure of employment in its delivery department and against giving preference for employment to members of the union. The order also required the Times to offer employment to the non-union employees who had filed

the charges and to others "without discrimination in regard to hire or tenure or other terms and conditions of employment because of their membership or non-membership in said union and without prejudice to their seniority and other rights and privileges". The order also required the Times to pay to thirteen employees listed in the order the sum of $400 each. The order further required the Times to—"(c) Post in conspicuous places in its New York plant where notices to employees are customarily posted, copies of notice attached hereto as 'Appendix A.' Copies of said notice to be furnished by the Regional Director of the Second Region, shall, after being duly signed by the official representative of the Times be posted by the Times immediately upon receipt thereof and maintained by it for a period of sixty (60) consecutive days thereafter. Reasonable steps shall be taken by the Times to insure that said notice is not altered, defaced, or covered by any other material."

On a petition by the Board to the United States Court of Appeals for the Second Circuit, and on the consent of The New York Times Company, Inc., that court entered its decree in practically the same language as the order of the Board and required the Times to post a notice (a copy of which was annexed to the decree) which provided against any discrimination in regard to hire and tenure, as did the Board's order.

On January 9, 1951 the New York Mirror Division—The Hearst Corporation stipulated to the entry of an order by the Board which was similar to that issued in the case against the Times and the order was issued by the Board on January

31, 1951. The United States Court of Appeals for the Second Circuit issued an enforcing decree on February 6, 1951 on an application of the Board consented to by the New York Mirror Division—The Hearst Corporation. The enforcement decree was similar to that entered by the Court in the case of the Times.

On June 29, 1950, the Board, pursuant to a settlement stipulation dated May 15, 1950, issued an order against the New York Herald Tribune Inc. which contained "cease and desist" provisions similar to those which were later issued in the Times case, and a provision for the payment of $200 to each of six non-union complainants. On July 15, 1950, the United States Court of Appeals for the Second Circuit entered an enforcement decree against the New York Herald Tribune Inc. which contained practically the same provisions as the Board's order.

On March 1, 1951, the Board, after a hearing before a trial examiner, issued a cease and desist order against the Hearst Consolidated Publications, Inc., as publisher of the Journal-American, and against the union. The order provided for certain affirmative relief to the non-union employees who had filed charges of discrimination against both the publisher and the union. The Board had reviewed the rulings of the trial examiner and affirmed them and adopted his findings, conclusions and recommendations with some modifications and additions. The trial examiner's report is dated August 22, 1950. The order of the Board dated March 1, 1951 is quite broad and detailed. The provisions of the order as directed to the union are set forth in a footnote.[1]

1. Order
Upon the entire record in the case, and pursuant to Section 10(c) of the National Labor Relations Act, as amended, the National Labor Relations Board hereby orders that:
I. The Respondent, Newspaper and Mail Deliverers' Union of New York and Vicinity, its officers, representatives, agents, successors, and assigns, shall:
1. Cease and desist from:
(a) Causing or attempting to cause the Respondent, The Hearst Consolidat-

ed Publications, Inc., its officers, agents, successors, or assigns, to discriminate against employees or applicants for employment, in violation of Section 8(a) (3) of the Act; and
(b) Restraining or coercing employees of the Respondent, The Hearst Consolidated Publications, Inc., its successors or assigns, or applicants for employment with the said Respondent, in the exercise of rights guaranteed in Section 7 of the Act, except to the extent that such right may be affected by an agreement requir-

During the pendency of the present proceeding before this Court the Board did not apply to the United States Court of Appeals for an enforcement decree against the publisher or the union in the Journal-American case. A copy of the Board's order of March 1, 1951 and the Trial Examiner's intermediate report, findings of fact and recommendations, are annexed to the petition in this present proceeding.

Also on March 1, 1951 the Board rendered a decision and order against the union, in the case which had been instituted against the union because of its unfair labor practices at the plant of the Herald-Tribune. A similar complaint had been filed against the publisher, New York Herald Tribune, Inc. and had been consolidated with the complaint against the union. The publisher had entered into a settlement stipulation on which the Board had issued a consent order against the publisher, New York Herald Tribune, Inc. on June 29, 1950 as hereinabove stated. The order of the Board against the union in the Herald Tribune case (dated March 1, 1951) is similar to the Board's order in the Journal-American case. Annexed to the Board's order is the report of the Trial Examiner. The Board in its decision adopted the findings, conclusions and recommendations of the Trial Examiner.

In the five cases above listed the Board had issued its complaints against the union. In two of them, the Herald-Tribune and Journal-American, the Board issued its orders against the union on March 1, 1951, the same day that the present proceeding against the union under Section 10(j) of the National Labor Relations Act as amended was filed in this Court. On March 1, 1951 there were still pending undetermined before the Board complaints issued by the Board against the union because of the union's unfair labor practices at the plants of the New York Times, the New York Mirror and the New York Daily News.

At the hearings in this proceeding I received proof not only as to the union's

ing membership in a labor organization as a condition of employment, as authorized by Section 8(a) (3) of the Act.

2. Take the following affirmative action which the Board finds will effectuate the policies of the Act:

(a) Notify The Hearst Consolidated Publications, Inc., that it has no objection to the hiring and employment of Anthony Fallara, Louis Salsano, Jack Tobin, Theodore Graff, Robert Krioski, Richard Ricco, George Honan, and Rocco Filazzola, or other persons, without regard to their membership or nonmembership in the Respondent Union or in any other labor organization, and without prejudice to their seniority or other rights and privileges, except to the extent authorized by Section 8(a) (3) of the Act;

(b) Post at its business offices and meeting halls copies of the notice attached hereto as Appendix A. Copies of said notice, to be furnished by the Regional Director for the Second Region, shall, after being duly signed by an official representative of the Union, be posted by it immediately upon receipt thereof and maintained by it for a period of at least sixty (60) consecutive days thereafter in conspicuous places, including all places where notices to members are customarily posted. Reasonable steps shall be taken by the Union to insure that said notices are not altered, defaced, or covered by any other material;

(c) Mail to the Regional Director for the Second Region signed copies of the notice attached hereto as Appendix A, for posting, the Respondent Company willing, at the Company's Journal-American plant in New York, New York, in places where notices to delivery department employees are customarily posted; and

(d) Notify the Regional Director for the Second Region in writing, within ten (10) days from the date of this Order, what steps the Respondent Union has taken to comply herewith.

* * * * * *

III. The Respondents, Newspaper and Mail Deliverers' Union of New York and Vicinity and The Hearst Consolidated Publications, Inc., their officers, agents, successors, and assigns, shall jointly and severally make whole Anthony Fallara, Louis Salsano, Jack Tobin, Theodore Graff, Robert Krioski, Richard Ricco, George Honan, and Rocco Filazzola, for any loss of pay they may have suffered as a result of the discrimination against them, in the manner prescribed in the remedy section of the Board's decision.

449

acts and conduct at the plants of the Times, the Mirror and the News, but also proof as to the union's activities at the plants of the Journal-American and the Herald-Tribune. Proof as to the latter was admissible for several reasons: first, under the doctrine that proof of similar acts may be made where an issue of intent is involved; second, on the question of the need for injunctive relief; and third, to determine the scope of the injunction to be issued. There was also some proof as to a work stoppage at the New York Post.

During the hearings in this Court about 700 typewritten pages of testimony were taken and 88 exhibits were received in evidence. The whole course of conduct of the union, from the time of the negotiations for a new contract in the summer of 1948 down to March 1, 1951 was the subject of testimony. Officers and employees of the publishers association and of the publishing companies were examined and cross examined. The president of the union, the night business agent and the day business agent, and the secretary of the union were heard. One business agent named Walsh, who was superseded in January 1951, did not take the stand to deny the detailed testimony as to his unlawful conduct at various plants of the publisher.

To sum up the situation disclosed by the proof offered at the hearings in this proceeding—there has been a regular course of conduct by the union, its officers, agents and members to circumvent the provisions of the Taft-Hartley Act, which abolished closed shop agreements, and to compel the newspaper publishers, by threats, work stoppages and slow-downs, to hire union men first and to discriminate against non-union men. Orders of the National Labor Relations Board have been disobeyed. Indeed, the enforcement decrees of the United States Court of Appeals against the publishers in the case of the Times, the Mirror and the Herald Tribune may also have been violated, since the publishers of those newspapers have been forced by threats or work stoppages or both to discriminate against non-union men.

■ Further, the officers and members of this union have shown themselves to be thoroughly irresponsible in the manner in which they have breached their contracts and arrangements made with the publishers. One of their own officers claims to be in fear of the membership. He explained his failure to be present at a newspaper plant when he knew the men were going to walk out, by saying that he was afraid of bodily violence by the men against himself. The excuse that the men were "sick" when they started a work stoppage—"mental sickness" Walzer called it—was also advanced to account for their work stoppage, which he claimed was a "wild-cat" strike not authorized by the officers. I do not give any credence to those explanations. I am convinced that what the men did at the various plants was done with the prior knowledge and approval of their officers and agents who did nothing to remedy conditions until the publishers yielded to the union's demands. The union is responsible for all that its members did by concerted action.

The union's attitude throughout has been defiant. As Walsh put it at one of the conferences with the publishers (October 19, 1950) "To hell with law and order, the union man goes to work first"; and the president of the union is quoted as saying: "If the publishers do not get into line, we will take the law into our own hands", and "If it has got to come to a fight we will fight, we got a good army. There aint going to be any union men turned away to night and I am giving the orders"; and "I aint interested in seniority for the non-union men. They can drop dead. I dont care who they are. They are not going to work before union men".

Even the pressure of other unions, who have collective bargaining agreements with the publishers, has failed to convince this union that it should make and keep agreements with the publishers. Nor has the "impartial chairman" of the Adjustment Board, set up under the collective bargaining agreement to adjust differences between the union and the publisher, been able to get the union to adhere to its decisions.

■ A free press is essential to the perpetuation of our form of government. To permit a comparatively few men to halt the publication of our city newspapers, in order to accomplish a clearly illegal purpose, is too great a threat to our freedom to let it go unchallenged. We should learn from the experience of people in other lands. Although I am opposed to the issuing of injunctions against labor unions, there are at times situations of great public interest where the reckless and law-defiant conduct of a few cannot otherwise be controlled. This is such a case.

I have signed the findings of fact submitted by the attorney for the Board. No criticism of them has been received from counsel for the union. A reading of the findings of fact will show in considerable detail the unfair labor practices of the respondent, its officers, agents and members at various newspaper plants in this City.

The findings of fact have been made in compliance with Rule 52(a)[2] of the Federal Rules of Civil Procedure, 28 U.S.C.A. Mayo v. Lakeland Highlands Canning Co., 309 U.S. 310 at page 316, 60 S.Ct. 517, 84 L.Ed. 774 and cases cited; City Line Center, Inc., v. Loew's Inc., 3 Cir., 178 F.2d 267. I believe that the form and scope of the restraining order which I have prepared complies with Rule 65(d)[3] of the Federal Rules of Civil Procedure.

■ The precise practice found to have violated a statute should be specifically enjoined in any restraining order. Schine Chain Theatres v. United States, 334 U.S. 110 at page 126, 68 S.Ct. 947, 92 L.Ed. 1245; May Dept. Stores Co. v. National Labor Relations Board, 326 U.S. 376 at page 392, 66 S.Ct. 203, 90 L.Ed. 145; Allen Bradley Co. v. Local Union No. 3, 325 U.S. 797 at page 811–812, 65 S.Ct. 1533, 89 L.Ed. 1939. The breadth of the injunction "must depend upon the circumstances of each case, the purpose being to prevent violations, the threat of which in the future is indicated because of their similarity or relation to those unlawful acts" which have been found to have been committed in the past. National Labor Relations Board v. Express Pub. Co., 312 U.S. 426 at page 436, 61 S.Ct. 693, 85 L.Ed. 930. It is in conformity with these principles that the restraining order has been drafted.

■ In limiting the preliminary injunction to the unfair labor practices of the respondent union at the plant of the Times, the Mirror and the News, as to which the Board has issued its complaints against the respondent union but has not as yet made a determination and order thereon, I believe I am following the language and purpose of Section 10(j) of the Act. I have not included within the scope of the preliminary injunction the illegal activities

2. "(a) Effect. In all actions tried upon the facts without a jury or with an advisory jury, the court shall find the facts specially and state separately its conclusions of law thereon and direct the entry of the appropriate judgment; and in granting or refusing interlocutory injunctions the court shall similarly set forth the findings of fact and conclusions of law which constitute the grounds of its action. Requests for findings are not necessary for purposes of review. Findings of fact shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge of the credibility of the witnesses. The findings of a master, to the extent that the court adopts them, shall be considered as the findings of the court. If an opinion or memorandum of decision is filed, it will be sufficient if the findings of fact and conclusions of law

appear therein. Findings of fact and conclusions of law are unnecessary on decisions of motions under Rules 12 or 56 or any other motion except as provided in Rule 41(b). As amended Dec. 27, 1946, effective March 19, 1948."

3. "(d) Form and Scope of Injunction or Restraining Order. Every order granting an injunction and every restraining order shall set forth the reasons for its issuance; shall be specific in terms; shall describe in reasonable detail, and not by reference to the complaint or other document, the act or acts sought to be restrained; and is binding only upon the parties to the action, their officers, agents, servants, employees, and attorneys, and upon those persons in active concert or participation with them who receive actual notice of the order by personal service or otherwise."

of the respondent union at the plants of the Journal-American and the Herald-Tribune, because the Board has not only issued a complaint thereon but has also made a determination after a hearing and has issued its final cease and desist orders. If the Board wishes to have its said orders against the union in the Herald-Tribune and Journal-American cases backed up by a Court order, the Board may apply to the United States Court of Appeals, Second Circuit, for enforcement and restraining orders under the provisions of Section 10 (e) of the Act.

It seems to me that Section 10 provides that after charges of unfair labor practices have been filed with the Board there are three stages during which the Board may seek injunctive relief in the form of a Court order:—(1) after investigation by the Board of the charges filed and before a complaint is issued, the Board may apply to the proper United States District Court for appropriate injunctive relief under Section 10(1) of the Act, pending the final adjudication of the Board, Douds v. Local 1250, Retail Wholesale Dept. Store Union, 2 Cir., 170 F.2d 695; (2) after the Board has issued a complaint but before the Board has decided the matter and issued its order, the Board may petition the proper United States District Court for appropriate temporary relief or restraining order, under Section 10(j) of the Act, Penello v. International Union United Mine Workers, D.C., 88 F.Supp. 935; Douds v. Local 294, Intern. Broth. of Teamsters Union, D.C., 75 F.Supp. 414; (3) after the Board had determined the matter and issued its order the Board may petition a United States Circuit Court of Appeals (or if all the United States Courts of Appeals are on vacation then a District Court of the United States) under Section 10(e) of the Act, on the record made before the Board, for the enforcement of the Board's order and for appropriate temporary relief or restraining order, which the court may grant after a hearing on notice to the respondent. N.L.R.B. v. National Maritime Union, 2 Cir., 175 F.2d 686.

If a restraining order, sufficiently broad to cover all the unfair labor practices of the union at the plants of the Times, the News and the Mirror, is now issued, it should suffice to warn the union against the commission of similar acts at the plant of any other newspaper. At least I expect that it will have that effect.

The restraining order will be entered at the time this opinion is filed.