**DOUDS et al. v. ANHEUSER–BUSCH, Inc. et al.**

**Civ. A. No. 536–51.**

United States District Court
D. New Jersey.
Aug. 17, 1951.

. Samuel Ross, Washington, D. C., for petitioner.

William F. Nies, Newark, N. J., for Beer Drivers, Helpers, Loaders, Unloaders and Washers Teamsters Local Union 153 of the International Brotherhood of Teamsters, Chauffeurs, Warehousemen & Helpers of America.

Parsonnet, Weitzman & Oransky, Newark, N. J., by Thomas L. Parsonnet, Newark, N. J., for AFL and Brewery and Affiliated Workers Union, Local 843 of the International Brotherhood of Teamsters, Chauffeurs, Warehousemen & Helpers of America, AFL.

Pitney, Hardin & Ward, Newark, N. J., Attorneys for Anheuser-Busch, Inc. By John R. Hardin, Newark, N. J.

Lindabury, Steelman & Lafferty, Newark, N. J., by James L. Lafferty, Newark, N. J., for New Jersey Brewers Assn.

MODARELLI, District Judge.

This is a statutory proceeding for "such temporary relief or restraining order as * * [the court] deems just and proper", arising under Section 10(j) of the National Labor Relations Act, as amended, 29 U.S.C. § 160(j), brought by the Regional Director of the Second Region of the National Labor Relations Board, on behalf of the Board against Anheuser-Busch, Inc., and Teamsters Locals 153 and 843 AFL. The proceedings came before this court through the means of an order to show cause. Charges have been made to the National Labor Relations Board, and a complaint

issued. A temporary restraining order was entered on June 13, 1951.

This court is called upon to decide whether the acts, as a matter of law, come within the practices defined by the Act as unfair and whether the evidence shows that there is reasonable cause to believe that the respondents engaged in such unfair labor practices. Douds v. Local 294, Teamsters Union, D.C.N.D.N.Y. 1947, 75 F. Supp. 414; Evans v. International Typographical Union, D.C.S.D.Ind. 1948, 76 F.Supp. 881; United Brotherhood of Carpenters & Joiners of America v. Sperry, 10 Cir., 1948, 170 F.2d 863; Shore, for Use and on Behalf of N.L.R.B. v. Building & Construction Trades Council, 3 Cir., 1949, 173 F.2d 678, 8 A.L.R.2d 731; Penello v. International Union, UMW, D.C.D.C. 1950, 88 F.Supp. 935.

·The ultimate determination of the truth of the charges and the existence of a violation is reserved exclusively to the Board, subject to review by the courts of appeals pursuant to Section 10(e) and (f) of the Act.

Specifically, the charge states that Anheuser-Busch, Inc., has engaged in unfair labor practices within the meaning of Section 8(a), Subsections (1), (2), and (3) of the Act, and respondents, Locals 153 and 843, have engaged in unfair labor practices within the meaning of Section 8(b), Subsections (1) (A) and (2) affecting commerce within the meaning of Section 2 (6) and (7) of the Act. It is conceded by all parties that the court has jurisdiction.

During January 1950, respondent, Anheuser-Busch, Inc., commenced construction of a brewery plant in Newark, New Jersey. During the construction phase, the United Brewery Workers CIO and the Teamsters Locals 153 and 843 AFL made conflicting demands for recognition as exclusive bargaining representatives of the employees in the various departments. After the brewery department was in operation, the CIO filed a petition with the National Labor Relations Board requesting certification as the representative of the workers in that department. On April 13, 1951, a consent election of the Board was held and the United Brewery Workers won over the rival AFL organizations. On May 18, 1951, the United Brewery Workers was certified by the Board as the exclusive bargaining representative of the brewery department.

On April 27, 1951, respondents, Teamsters Locals 153 and 843, sought recognition from Anheuser-Busch, Inc., as exclusive bargaining representatives of the *employees that were yet to be hired* in the bottling, freight handling, and several smaller departments. At that time, there were only four (4) employees in the freight handling department and none in the other departments. These Locals threatened to picket Anheuser's Newark plant if their demand was refused. The Newark plant was still in the process of construction, and the Essex County Building Trades Council AFL, through its president, made known to Anheuser-Busch, Inc., that in the event of picketing by their brother AFL locals, the construction men would refuse to cross the picket line, and immediately an agreement was made to enter into contracts between the respondents, Anheuser-Busch, Inc., and Locals 153 and 843. The Locals were referred by Anheuser-Busch, Inc., to the New Jersey Brewers Association for the negotiation of the contracts, and they were executed on the same day, April 27, 1951, at the Office of the Association. These contracts covered the prospective employees in all but the brewing department of the Newark plant.

On March 3, 1951, it was orally agreed between Anheuser-Busch, Inc., and Local 153 that the Local would refer to the Company a list of men from which the Company would select its employees. Subsequently, the Company hired twenty-three (23) men so referred by the Union for their freight handling department. A similar oral agreement was concluded between the Company and Local 843, and pursuant to it Local 843 referred approximately fifty (50) men to the Company for positions in the bottling department and smaller units. On June 13, 1951, the Company hired ten (10) men from this list of fifty (50). The Company also hired two (2) porters, three (3) checkers, and three (3) stockhandlers who had been approved

by Local 843. These agreements naturally resulted in discriminatory hiring practices. Over ten thousand (10,000) applications for employment had been received by the Company for about one thousand (1,000) job openings, which applications were disregarded as a source of manpower. The hired employees had their bargaining representatives already chosen for them as a result of the contracts.

The National Labor Relations Board does not carry the sole responsibility of enforcing the Act. The United States District Courts have been entrusted with a share of that responsibility, and they have not shirked that responsibility. Douds v. Local 294, Teamsters Union, supra; Evans v. International Typographical Union, supra; Madden v. International Union, UMW, D.C.D.C. 1948, 79 F.Supp. 616; Curry, for and on Behalf of N.L.R.B. v. Union De Trabajadores De La Industria, Del Cemento Ponce, D.C. Puerto Rico, San Juan Division 1949, 86 F.Supp. 707; Penello v. International Union, UMW, supra; Jaffee v. Newspaper & Mail Deliverers' Union of New York & Vicinity, D.C.S.D.N.Y. 1951, 97 F.Supp. 443.

Section 10(j) of the Act gives the court jurisdiction to grant "such temporary relief or restraining order as it deems just and proper." Congress clearly intended that the court should exercise its discretion with due regard to the large objectives of the Act. Douds v. Wine, Liquor & Distillery Workers Union, Local No. 1, D.C.S.D.N.Y. 1948, 75 F.Supp. 447. This intent is evident in the Majority Report of the Senate Committee on Labor and Public Welfare, Senate Report 105–80th Congress, 1st Session, where it is stated:

" * * * the relatively slow procedure of Board hearing * * * falls short of achieving the desired objectives—the prompt elimination of the obstructions to the free flow of commerce and encouragement of the practice and procedure of free and private collective bargaining. Hence we have provided that the Board, acting in the public interest and not in vindication of purely private rights, may seek injunctive relief in the case of all types of unfair labor practices * * *." (P. 8)

" * * * It has sometimes been possible for persons violating the act to accomplish their unlawful objective before being placed under any legal restraint and thereby make it impossible or not feasible to restore or preserve the status quo pending litigation." (P. 27)

In obedience to this and similar intent of Congress and the desire to effectuate a statutory policy, the courts have consistently held that the grant of the injunction depends upon the standards set forth in the statute and not upon traditional equity criteria. S.E.C. v. Jones, 2 Cir., 1936, 85 F.2d 17; S.E.C. v. Torr, 2 Cir., 1937, 87 F.2d 446, 450; Virginian Railway Co. v. System Federation No. 40, 1937, 300 U.S. 515, 552, 57 S.Ct. 592, 81 L.Ed. 789; American Fruit Growers v. United States, 9 Cir., 1939, 105 F.2d 722; United States v. Adler's Creamery, Inc., 2 Cir., 1940, 110 F.2d 482; Hecht Co. v. Bowles, 1944, 321 U.S. 321, 331, 64 S.Ct. 587, 88 L.Ed. 754; Douds v. Local 294, Teamsters, supra, 75 F.Supp. at pages 417, 418.

The purposes of the Act are clearly expressed in Section 1(b), 29 U.S.C.A. § 141(b): "to promote the full flow of commerce, to prescribe the legitimate rights of both employees and employers in their relations affecting commerce * * * to protect the rights of individual employees in their relations with labor organizations * * * to define and proscribe practices on the part of labor and management which affect commerce and are inimical to the general welfare * * *." This statutory policy is effectuated by Section 7 of the Act, Title 29 U.S.C.A. § 157, wherein it is guaranteed that "Employees shall have the right to self-organization * * * to bargain collectively through representatives of their own choosing * * *." (Emphasis supplied.) The Supreme Court has been quick to uphold this guarantee. N.L.R.B. v. Jones & Laughlin Steel Corp., 1937, 301 U.S. 1, 23, 33, 57 S.Ct. 615, 81 L. Ed. 893; N.L.R.B. v. Pennsylvania Greyhound Lines, 1938, 303 U.S. 261, 266, 58 S. Ct. 571, 82 L.Ed. 831.

478

Prior to construction of the Newark plant, the only unit operated by Anheuser-Busch, Inc., in this State was its distribution branch at Kearny. The Company was an associate member of the New Jersey Brewers Association. After commencing construction at the brewery in Newark, Anheuser-Busch, Inc., became a full-fledged member of the New Jersey Brewers Association. It had, as an associate member bargained through the Association with Teamsters Local 153. The defense is made that because industry-wide bargaining was negotiated through the Association before, and because these contracts in the instant case were confirmed through the Association, they were proper and not a violation of the Act.

Section 9 of the Act, 29 U.S.C.A. § 159 (b), provides that: "The Board shall decide in each case whether * * * the unit appropriate for the purposes of collective bargaining shall be the employer unit, craft unit, plant unit, or subdivision thereof * * *."

■ The Board has construed this section to include also multi-employer units, and has on occasion approved such industry-wide bargaining units. Three (3) factors are considered by the Board in determining whether industry-wide bargaining is to be allowed:

1. The history of collective bargaining in the area under consideration.

2. The practicable operation of the unit.

3. Whether the employees desire to be so represented. "The Board has always held that employees themselves must give some evidence, direct or indirect, * * * that they wish to be allied in collective bargaining with the employees of other employers." CCH Labor Law Reporter, Paragraph 2610. California Metal Trades Association, 72 NLRB 628.

The respondents cite California State Brewers Institute, So.Div., 90 NLRB #209, decided August 2, 1950, as upholding their position. In that case, the Board approved contracts which were negotiated by the association and which were adopted by both members and non-members of the association stating that, "This indicated the de-

sire on the part of the participants (that is the employers) to be bound by the joint action" and a single multi-employer unit was considered appropriate, but this case can never be interpreted to hold that the employees are bound to accept as *their* representatives at the bargaining table a union which they did not select. In the case of Hazel-Atlas Glass Co., 59 NLRB 706, also cited by respondents, the CIO filed charges against the company alleging that it assisted the AFL organization when the company negotiated a contract with the AFL through an employer-association. The Board rejected the CIO objection but only after a consent election was held in which the employees voted for representation by the AFL, and the Board held that by selection of the AFL the employees had affirmed the association-wide negotiations. It is clear that the instant case is not comparable.

In the William-Penn Broadcasting Co. Case, 93 NLRB #201 (April 2, 1951) which is cited by respondent, Local 843, as its strongest case, the employer had been bargaining for twelve (12) years with the American Communications Association. The International Brotherhood of Electrical Workers filed a petition with the Board for certification as a representative of thirteen (13) technicians and engineers who had heretofore been included in the overall unit of production and maintenance employees. While this petition was still pending, the employer renewed its contractual relations with the American Communications Association and the Brotherhood filed charges against the employer for unfair labor practices. The Board held that the pendency of a petition for certification does not impose a duty upon the employer to refrain from continuing to recognize and deal with an incumbent bargaining representative. But to interpret this case to hold that the Board will recognize a union as an incumbent bargaining agent for employees who are *yet to be* hired because that union was the bargaining agent for other employees in other plants whose employers are members of a state-wide association is to strain the holding of that case to its breaking point and

lose sight of the fundamental purposes of the Act as expressed in Section 1 and the rights guaranteed by Section 7. The employees in the William-Penn Case had for twelve (12) years been represented by the American Communications Association. In the instant case, the AFL had no such claim as designee.

The case of W. S. Ponton of N. J., Inc., 93 NLRB 182 holds only that an employer may not withdraw from an appropriate industry-wide unit during the term of the contract negotiated by the association. Such a situation is not involved here. That case cannot be interpreted to deprive employees of their right to voice their preference for their bargaining agent.

In Potlatch Forest, Inc., 94 NLRB #216, under a similar set of facts, an AFL union sought to represent a new plant under construction by the company, while the company and the CIO urged that the negotiations should be carried on through the existing company-wide bargaining unit. The Board held that the existing unit could represent the employees *if* the employees of the mill so desired, and directed that an election be held to determine the question. See also Drewrys Limited U. S. A., Inc., 44 NLRB 1119; Chicago Freight Car & Parts Co., 83 NLRB 1163; General Motors Corp., 56 NLRB 1887; American Steel & Wire Co. of N. J., 63 NLRB 1244, 1246; United States Cartridge Co., 42 NLRB 191; Pepsi-Cola Bottling Co. of Kansas City, 55 NLRB 1180; International Longshoremen's & Warehousemen's Union, 90 NLRB 166; Merry Shoe Corp., 10 NLRB 457. In each of these cases the employees had a voice in choosing their representatives.

The grant of an injunction in this case should in no wise be interpreted to prevent the Company from transferring the men employed at the Kearny branch to the new plant in Newark, nor does this court hold that if the Company desired to transfer the freight handling department bodily from the Kearny branch to the new Newark plant that it could not recognize Local 153 as the bargaining agent for *these* men. This may be entirely possible. Yale Rubber Mfg. Co. & United Rubber Workers of America CIO, 85 NLRB 131; Decker Clothes, Inc., 83 NLRB 484. But such a situation is not before the court and it does not now decide the point.

No basis has been shown for the speculation indulged in by the attorney for Teamsters Local 153 to the effect that the injunction will detrimentally affect freight handlers at Kearny, and this injunction is not to be construed to affect the employment and seniority rights of the employees of the Kearny branch.

The court should mention in passing that the transcript of testimony in this case covers eight hundred six (806) pages, all of which was heard during five (5) hot, humid, and torrid days in the beginning of July.

I realize that the question of injunctions in labor disputes has been one of the hottest subjects of political controversy for many years. I personally am opposed to the issuance of injunctions in labor disputes, except in the public interest or when required by law in any given set of compelling circumstances. I also believe that the power of courts to issue injunctions in labor disputes should be sharply limited by statute. I find myself in this case not concerned with so much who is right, but what is right. I have found reported six (6) cases, heretofore cited, involving applications by the National Labor Relations Board for relief under Section 10(j), and in each instance the injunction was granted because the court felt that the facts warranted it, and assumed its share of the responsibility of enforcing the Act. I so feel in this case.

The court decides that the National Labor Relations Board has made out a case for a preliminary injunction. For the protection of the public interest and for the purpose of effectuating the policies of the Act, in accordance with Section 10(j) of the Act, and pending final adjudication of the Board with respect to the violation herein involved, a preliminary injunction is granted.

The foregoing shall be taken as the Findings of Fact and Conclusions of Law.

Settle order on notice.