## MADDEN v. INTERNATIONAL UNION, UNITED MINE WORKERS OF AMERICA et al.

### Civ. A. No. 2141–48.

United States District Court
District of Columbia.

June 4, 1948.

Robert N. Denham, Gen. Counsel, David P. Findling, Associate Gen. Counsel and Winthrop A. Johns, Trial Atty., all of Washington, D. C., for petitioner.

Welly K. Hopkins and Harrison Combs, both of Washington, D. C., and M. E. Boiarsky, of Charleston, W. Va., for respondents.

GOLDSBOROUGH, Associate Justice. (Orally)

Gentlemen, as you know, there is a motion on the part of the National Labor Relations Board for a mandatory injunction requiring the United Mine Workers of America and John L. Lewis their president to bargain collectively with the mine operators.

That motion is based on a law passed in 1947, 29 U.S.C.A. § 141 et seq. The material parts of the law say that "it shall be an unlawful labor practice for a labor organization or its agents to restrain or coerce an employer in selection of his representatives for the purpose of collective bargaining for the adjustment of grievances."

The law, of course, requires collective bargaining—and has, certainly, since 1935 —probably before that—but I am perfectly clear that it has been required since 1936.

The defense to this petition, made by the United Mine Workers and their president, is, first, to the effect that there are procedural difficulties confronting the petitioners.

The Court is not going to discuss them, for this reason: The Court thinks that they are not of sufficient significance to justify discussion.

The Court thinks that they are disposed of effectively in the case of Evans, the regional director of the Ninth Region, National Labor Relations Board, v. International Typographical Union and others, decided in the United States District Court, Southern District of Indiana, No. 1587, on February 25, 1948. 76 F.Supp. 881. The Court hasn't had any difficulty at all about the indicated matters.

Then the defendant says that the Court is without jurisdiction to pass a preliminary injunction for the purpose of assisting an administrative agency, that it has no power to pass a preliminary injunction in a matter in which it does not have final jurisdiction.

The Court doesn't think that there is any authority which bears that out.

The Court realizes that various statements in which the factual situation is different from this might appear to lend color to defendants' contention, but the Court also thinks that it is perfectly obvious to any student of the law that, for several hundred years, the very sort of thing which it is here requested that a court of equity do has been done in England and in this country.

Then the question arises as to whether or not there is sufficient debatable factual matter which the Labor Board will have to consider, beginning on June 8, which is of such a character, such a serious character, that a court of equity should not undertake to act—certainly until that factual matter has been analyzed and disposed of, I should say, by the National Labor Relations Board.

Let's see whether there is any substantial factual matter. The defendant, in its motion to dissolve or to have dismissed the rule to show cause, and in its motion for a summary judgment, has attached an affidavit of the defendant John L. Lewis. In so far as that affidavit is self-serving, it is of no possible interest to the Court, because testimony favorable to the defendants' contention would, of course, have to be supported by evidence which would be subject to cross examination, but, in so far as it contains matter which is against the interests of the defendants, the Court

can consider it, because the law presumes—and presumes logically and sensibly—that an individual doesn't make an admission against his interests unless it is true. .

Now, let's see what the affidavit contains, and what the argument of counsel for the defendants contains in support of its contention and in support of the allegations in the affidavit.

The allegations in the affidavit, in so far as the issues here are concerned, say that the Southern Producers Association doesn't want a contract.

The Court assumes that what that means is that the Southern Producers Association wants to destroy the labor unions.

Well, of course, no one could think any more strongly than the Court that it would be a terrible national calamity for the unions to be destroyed or for anything to happen to them which would destroy their legitimate effectiveness.

And the Lewis affidavit says that, although they have been the bargaining agent of the Southern operators—some 19 Southern operators, I think—since 1941, that they have never been cooperative in the sense of indicating that they wanted to make any sort of a bargain.

The Court said on Wednesday that the Court would give the defendants every opportunity to establish any fact they could establish before the Examiner of the Labor Relations Board, beginning on June 8, and indicated that, if that testimony was of such character as to show that the Southern Producers Association, if the labor union was compelled to attempt to bargain with them in connection with the other operators, that their action would be such that it would do the negotiations more harm than good, the Court wouldn't feel under any obligation to grant the injunction.

The defendants decided not to take advantage of the Court's suggestion, and to rely upon the record. All the record means, in so far as any matter contained in it, of which the Court can take cognizance, and all the argument of counsel for defendants means is that, although Mr. Lewis, as their agent, represents the Union employees in 99 business units, that the Southern Pro-

ducers Association shall not represent 19 business units involving the operators.

Now, of course, that is an inconsistent position to take. It may be—and it probably is—very useful to the United Mine Workers that they are able to consolidate their forces with one representative, and while I am not a labor expert at all, it might be a mighty good thing for the operators, for the unions, and for the country, if the operators would get together and appoint one representative—one salaried man—who could keep in touch with the situation the year round and be in position to bargain, not only effectively but reasonably and logically.

But certainly it is unreasonable, in this particular case, for the unions to say that "we are entitled to one representative for our whole industry, 99 business units," and that "the Southern Producers Association are not entitled to represent 19 independent units of operators."

It is not only not logical but it is not reasonable.

Of course, a matter can be logical without being reasonable. Logic is a good servant, but it is a terrible master.

Then the affidavit of Mr. Lewis and the argument of counsel for the defendants goes on to say this: that it has no objection to Mr. Joseph E. Moody, who is president of the Southern Producers Association, representing the Southern operators—I will say 19; I think that is the number—the 19 Southern operators, provided he represents them directly, but he must not represent them through the Southern Producers Association.

It appears that he is president of the Southern Producers Association, and therefore it is inevitable that, in his negotiations, he will be subject to exactly the same influences if he technically represents the 19 southern producers as he would be if he represented them through the Southern Producers Association; because the Southern Producers Association, whatever its technical designation might be, would certainly control his actions to the same manner and to the same extent as it would if he represented the Southern Producers Association directly.

So that the evidence before me, when analyzed, indicates that what the United Mine Workers and Mr. Lewis want to do is to destroy the Southern Producers Association because it is harder to deal with a unit of that kind than it would be to deal with the 19 separate operators. And that is no reason at all insofar as this particular action is concerned, and I am only discussing it in order to try to measure the equities and the proprieties insofar as not only the operators and the miners are concerned, but the rest of the country.

■ The law is perfectly plain, and as I have attempted to indicate by such analysis as I have been able to make of the situation, there is no substantial question of fact which will be heard or can be heard by the National Labor Relations Board other than the fact that Mr. Lewis doesn't want to bargain with the Southern Producers Association because they are hard to bargain with, and because he doesn't like their attitude.

The Court sees no reason why a mandatory preliminary injunction should not issue requiring him, Lewis, to bargain, requiring the Union to bargain. When I say "him" it is perfectly evident that he is the actual agent in operation of the United Mine Workers.

There is another consideration, it seems to me, and while I don't know anything about the mining industry particularly I think I can see this very readily: That if Mr. Lewis is able to bargain successfully, as he of course I am certain will be, with the operators, other than the southern operators designated by the Southern Producers Association, if he is able to make a contract with them, then the Southern Producers Association will be compelled to sign a contract or else they will get no coal.

So the Court is compelled to reach the conclusion that Mr. Lewis' attitude is a tactical attitude, that what he wants to do is to destroy the Southern Producers Association, and they may need destroying as far as I know anything about it, but there is no evidence of it in the case, and the Court is unable to say that even if it were true, as has not been established in this case at all, if it were true that they have

been obstinate in the past it doesn't justify the ultimate conclusion that they haven't had a change of heart and don't see now that what they should do is to go along with the other operating organizations.

I don't want to repeat, and I am not going to repeat consciously, anything I said on Wednesday. This is a situation which, of course, affects our entire social fabric. It seems that anyone who has any historical knowledge of the condition that labor was in before it was unionized would agree that labor not only has the right but should do every thing it can to consolidate its legitimate interests.

But when the time comes that any movement, whether it be a movement of labor or what not, undertakes to carry out its wishes by methods which would ultimately disintegrate society, at that point it must stop. It can't advance its interests to that point.

The Court as an individual through a good many years has found several observations very helpful. The Court thinks they do two things, they assist those in responsible positions to maintain their proper sense of proportion, and assist the citizen in evaluating the individual who is in power. One of them is this; it is an observation made by Lord Acton:

"Power always corrupts; and absolute power corrupts absolutely."

Another one is:

"There is no such thing as a benevolent despot."

Years ago when I was some thirteen or fourteen years old I remember—and what I am saying now is entirely impersonal, and I am perfectly sincere in saying that, entirely impersonal—I remember reciting Cicero's first oration against Catiline, and I might be misquoting the exact language of the translation, but I think I have its substance. It is just an exclamation:

"It is your boundless audacity, O Catiline!"

I will sign the order of the National Labor Relations Board.

Findings of Fact and Conclusions of Law

This cause came on to be heard upon the verified petition of Ross M. Madden, Re-

gional Director of the Fifth Region of the National Labor Relations Board, on behalf of said Board, for a temporary injunction, pending final adjudication of the Board of the matters involved, and upon issuance of a rule to show cause why an injunction as prayed should not be issued. Respondents filed a motion to dissolve and vacate the rule to show cause, dismiss the petition and for summary judgment on the ground inter alia, that Section 10(j) of the National Labor Relations Act, as amended, June 23, 1947, 29 U.S.C.A. § 141, et seq.; herein called the Act, under which this proceeding was instituted, is unconstitutional and that the proceeding was not properly initiated. Respondents also filed an answer to the petition and affidavit of respondent Lewis. A hearing on the rule to show cause and the motion of respondents was held on June 2, 1948. All parties were afforded full opportunity to be heard, examine and cross-examine witnesses, present evidence bearing on the issues and to argue on the evidence and the law. Respondents failed to produce any testimony to sustain their defense to the petition and rested on the unsupported statements contained in respondent Lewis' affidavit. The Court has fully considered the petition, motion, answer, evidence, briefs and arguments of counsel. Upon the entire record, and in accord with the oral opinion of the Court delivered on June 4, 1948, the Court makes the following:

### Findings of Fact

1. Petitioner is Regional Director of the Fifth Region of the National Labor Relations Board (herein called the Board).

2. Respondent International Union, United Mine Workers of America (herein called UMW), an unincorporated association, is a labor organization having its principal office in the District of Columbia and is engaged and at all times material herein has been engaged in promoting and protecting the interests of its members and of members of its subordinate local unions within the District of Columbia and elsewhere in the United States.

3. Respondent UMW represents for purposes of collective bargaining approximately 99 percent of the employees of bituminous coal mines in the country.

4. Respondent John L. Lewis is, and at all times material to this matter has been, president and an agent of respondent UMW engaged in the District of Columbia and elsewhere in the United States in promoting and protecting the interests of members of respondent UMW.

5. On or about May 19, 1948, Southern Coal Producers' Association (herein called Association), pursuant to the provisions of the Act, filed a Supplemental Charge with the Board alleging that respondents have engaged in and are engaging in unfair labor practices within the meaning of Section 8(b), subsections 1(B) and (3) of the Act, and affecting commerce within the meaning of Section 2, subsections (6) and (7) of the Act.

6. On May 24, 1948, the General Counsel of the Board, on behalf of the Board, by petitioner, issued a Complaint charging respondents with engaging in violations of Section 8(b), subsections (1) (B) and (3) of the Act, and affecting commerce within the meaning of Section 2, subsections (6) and (7) of the Act, as charged.

7. There is reasonable cause to believe that:

(a) Association is, and at all times herein material has been, a corporate membership association, incorporated under the laws of the State of West Virginia and having its principal office and place of business in the District of Columbia. Association's membership consists of producers of bituminous coal and district associations of producers of bituminous coal. The producer members of Association and the members of the district associations which are members of Associations are engaged in the mining and distribution of bituminous coal in the Southern Appalachian area of the United States, including the States of Virginia, West Virginia, Kentucky, Tennessee, and Alabama.

(b) Association, as part of its functions, is authorized by its articles of incorporation and by-laws, and at all times herein material, has been and now is designated, to bargain collectively for employers with respect to rates of pay, wages, hours of employment, and other conditions of employ-

ment, with the collective bargaining representative of the employees of such employers. Approximately 19 coal producers and district coal producers' associations have authorized and designated Association for this purpose.

(c) The coal producers and members of the producers' associations who have designated Association as their collective bargaining representative, annually mine, produce and distribute approximately 160,000,000 tons of bituminous coal, which amount constitutes approximately one-third of all the bituminous coal mined, produced and distributed annually in the United States. A substantial part of this coal is distributed in the United States and foreign countries through the channels of interstate commerce.

(d) At all times herein material, respondent UMW was, and now is, the exclusive representative of employees of the coal producers and members of the coal producers' associations that have designated Association as their collective bargaining representative, in a unit or units appropriate for collective bargaining within the meaning of Section 9, subsections (a) and (b) of the Act.

(e) During the past several years it has been the practice for respondents to meet periodically with bituminous coal producers or their representatives in collective bargaining for the purpose of negotiating a basic agreement fixing rates of pay, wages, hours of employment, and other conditions of employment of employees in the bituminous coal industry for a definite period of time.

(f) On, and at all times since April 30, 1948, respondents, although requested by Association to do so, failed and refused, and are failing and refusing to meet and bargain collectively with Association as the representative of the coal producers and members of the coal producers' associations that have designated Association for such purpose.

(g) On, and at all times since May 18, 1948, respondents, although requested by Association to do so, refused, and are refusing, to permit Association to participate with representatives of other employers in the bituminous coal industry in conferences held with respondents to negotiate through collective bargaining a basic agreement fixing rates of pay, wages, hours of employment, and other conditions of employment of employees in the bituminous coal industry of the country for a period of time succeeding the present basic agreement for such employees which expires on June 30, 1948.

(h) Respondents, by their conduct above:

1. Have restrained and coerced, and are restraining and coercing, employers in the selection of their representative for the purposes of collective bargaining or the adjustment of grievances; and

2. Have refused, and are refusing, to bargain collectively with employers for employees which respondent UMW represents for such purposes under the Act.

8. Respondents have indicated no intention to discontinue their refusal to meet and bargain collectively with Association as the representative of the employers who have selected and designated it for such purpose. On the contrary, respondents have displayed every intention of continuing their conduct unless restrained.

9. There is imminent danger and great likelihood, from the past conduct of respondents and from the history of collective bargaining negotiations in the bituminous coal industry that as a result of respondents' refusal to bargain collectively as aforesaid a new agreement for the bituminous coal industry or the substantial part thereof represented by Association will not be negotiated by June 30, 1948, when the present agreement expires. It is reasonable to anticipate from custom and practice of the employees in the coal industry in the past that the coal miners represented by respondents will engage in a stoppage of work and that operations in the mines in which they are employed will therefore cease, on or after June 30, 1948, if no new agreement is negotiated between their employers and respondents, to succeed the agreement expiring June 30, 1948. Such cessation of production of coal not only will result in substantial and irreparable damage to the coal producers affected but may necessitate the closing or curtailment of transportation, public utilities and other services essential to the public health

622

and welfare, and seriously impede the free flow of commerce among the several States and with foreign countries, thereby causing immediate, substantial, and irreparable injury to the Nation.

### Conclusions of Law

1. The coal producers and members of coal producers' associations who have selected and designated Association as their representative for purposes of collective bargaining are engaged in commerce within the meaning of Section 2, subsections (6) and (7) of the Act.

2. Respondent UMW is a labor organization within the meaning of Section 2, subsection (5) of the Act.

3. Respondent John L. Lewis is an agent of respondent UMW within the meaning of Section 8(b) of the Act.

4. Section 10(j) of the Act is constitutional.

5. The Board, under the Act, properly delegated authority to petitioner to institute this proceeding.

6. The relief sought by petitioner would not impair the obligation of contracting parties as contained in the National Bituminous Coal Wage Agreement of 1947.

7. Association is a "representative" within the meaning of the Act.

8. This Court has jurisdiction of the proceedings and of respondents and to grant injunctive relief under Section 10(j) of the Act.

9. There is reasonable cause to believe that respondents, and each of them, have engaged in unfair labor practices within the meaning of Section 8(b), subsections (1) (B) and (3) of the Act, and affecting commerce within the meaning of Section 2, subsections (6) and (7) of the Act.

10. To preserve the issues presented for the orderly determination of the Board as provided in the Act, and to avoid irreparable injury to the Nation, to the policies of the Act, and to employees and employers, it is appropriate, just and proper that, pending final adjudication by the Board of the said issues, respondents, their agents, servants, employees, attorneys, and all persons acting in active concert or participation with them be enjoined and restrained from the commission or continuation of the acts and conduct set forth in the findings of fact above, acts in furtherance or support thereof, and like or related acts or conduct whose commission in the future is likely or fairly may be anticipated from respondents' acts and conduct in the past.