### BROWN v. NATIONAL UNION OF MARINE COOKS AND STEWARDS et al.

No. 30849.

United States District Court
N. D. California, S. D.
Nov. 20, 1951.

James F. Foley, San Francisco, Cal., for petitioner.

Gladstein, Andersen & Leonard, Brobeck, Phleger & Harrison, and Treadwell & Laughlin, all of San Francisco, Cal., for respondents.

LEMMON, District Judge.

Gerald A. Brown, Regional Director of the Twentieth Region of the National Labor Relations Board, acting for and on behalf of the Board, seeks in this proceeding an injunction under Section 10(j)

of the National Labor Relations Act, 29 U.S.C.A. § 160(j), enjoining the respondents from engaging in certain alleged unfair labor practices.

The petition alleges that there are pending and undetermined charges filed by various individuals alleging, *inter alia,* that respondent National Union of Marine Cooks and Stewards, referred to herein under the designation given to it by the parties as MC&S, has been and is engaging in unfair labor practices within the meaning of Section 8(b) subsections (1)(A) and (2) of the Act, 29 U.S.C.A. § 158(b)(1) and (2),[1] and that respondents Matson Navigation Company and American President Lines, herein referred to as Matson and APL respectively, have been and are engaging in unfair labor practices within the meaning of Section 8(a), subsections (1) and (3) of the Act.[2] Following an investigation, complaints were issued by the Board pursuant to Section 10(b) charging these practices. Answers have been filed by each of the respondents. Essentially, the issues joined relate to the factual and legal *quare* as to respondents' conduct. There is dispute as to facts as well as to the legal consequences flowing from the facts if established.

It is conceded that the MC&A is a labor organization within the meaning of the Act. Respondents Matson and APL are ship operators and members of the Pacific Mari-

---

1. 29 U.S.C.A. § 158. (b) It shall be an unfair labor practice for a labor organization or its agents—(1) to restrain or coerce (A) employees in the exercise of the rights guaranteed in section 157 of this title: * * *

(2) to cause or attempt to cause an employer to discriminate against an employee in violation of subsection (a) (3) of this section or to discriminate against an employee with respect to whom membership in such organization has been denied or terminated on some ground other than his failure to tender the periodic dues and the initiation fees uniformly required as a condition of acquiring or retaining membership; * * *.

2. 29 U.S.C.A. § 158. (a) It shall be an unfair labor practice for an employer—
(1) to interfere with, restrain, or coerce employees in the exercise of the

rights guaranteed in section 157 of this title; * * *

(3) by discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization: * * *.

29 U.S.C.A. § 157 provides: Employees shall have the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection, and shall also have the right to refrain from any or all of such activities except to the extent that such right may be affected by an agreement requiring membership in a labor organization as a condition of employment as authorized in section 158(a) (3) of this title.

time Association (referred to as PMA) which is composed of West Coast owners and operators of ocean-going vessels, steam schooners and waterfront employers. MC&S is the collective bargaining representative of the employees in the cooks' and stewards' departments of vessels operated by members of PMA. Matson and APL have employed in their respective stewards' departments personnel secured through the offices of MC&S pursuant to provisions of an agreement between PMA and MC&S under which the members of PMA agree to secure all unlicensed personnel within the classification here concerned from that source. In aid of this MC&S maintains hiring halls at various ports. When help is needed, the employer notifies MC&S and men as required are then dispatched by MC&S with assignment slips to the vessel. The employees thus dispatched, if found satisfactory by the ship owner, are assigned to the jobs for which they have been dispatched. No attack is made upon the validity of the agreement, since the agreement has been approved by the Board. It contains a provision against discrimination by reason of "legitimate union activity" and between members and non-members of the union.

In the summer of 1950 certain members of MC&S, including certain of the complaints in the proceedings before the Board, formed a committee which was called "The Committee to Combat Communist Influence Within the MC&S" to oppose what they considered to be subversive forces and control therein arising subsequent to the disassociation of MC&S from the Congress of Industrial Organizations. The National Maritime Union, herein referred to as NMU, a union affiliated with the CIO, began a campaign to organize the employees in the unit represented by MC&S. The Sailors' Union of the Pacific also became active in organizing those employees. Each

of the complainants was a member of MC&S at the inception of the alleged unfair labor practice against him, and an employee in the stewards' department upon a vessel operated by either one or the other of the respondent steamship companies.

This Court is called upon to determine whether there has been a sufficient showing calling for the granting of a restraining order or other appropriate temporary relief. A preliminary injunction is not predicated upon an anticipated determination of issues of fact which may be involved. The determining criteria is 1—whether the Board had reasonable cause to believe that the charges of unfair labor practices were true, and 2—that injunctive relief is just and proper under the facts in evidence[3]. As to the first factor, the test is whether a reasonable person would believe the facts to constitute a violation of the law. The facts are not required to be sufficient to constitute such violation[4], or to establish that the charges are true[5]. A prima facie case[6], or a probability of violation[7], is all that is required.

Under the seniority plan as applied in the stewards' departments, which plan was worked out by MC&S and PMA under the contract and put into operation with the knowledge of the steamship companies, seniority is determined by length of service. A senior waiter has the choice of stations over his junior. If a member of the stewards' department is to be laid off, the junior in service is laid off. A man may remain in continuous service if he has seniority and a man with less seniority may be replaced by a man with greater seniority.

What is named the "swing plan" was instituted by MC&S. Under that plan, in effect until recently, a man who at the end of a voyage had been on the next preceding three voyages did not sail on the fourth. His place on the fourth was filled

3. Douds v. Confectionary & Tobacco Jobbers Emp. Union, D.C., 85 F.Supp. 191.

4. LeBaron v. Los Angeles Bldg. & Const. Tr. Council, D.C., 84 F.Supp. 629.

5. Shore v. Bldg. and Const. Tr. Council of Pittsburgh, 3 Cir., 173 F.2d 678, 8 A.L. R.2d 731.

6. Styles v. Local 760, D.C., 80 F.Supp. 119.

7. Douds v. Wine, Liquor & Dist. Workers Union, Local 1, D.C., 75 F.Supp. 447.

by the swing man. Thus the plan afforded employment for four men on three jobs. The other two respondents disapproved of it. They knew, however, that it had been put into effect and that an employee off the vessel on which he was employed on what has been referred to as a "swing trip" was entitled to return to his old job on the following trip. The men who are to be "off on swing" signed off just prior to or shortly following the end of the voyage and they were replaced by men who were sent at the request of the ship from the hiring hall and presented assignment slips issued by the union. A swing trip was not considered by MC&S to be either a break in service or a break in seniority. A man "on swing" had his card marked by the dispatcher "reship" on the ship on which he had been employed. This entitled him to assignment to his old job on the following voyage if he presented himself to the dispatcher's window within a certain period of time prescribed by the union shipping rules. APL and Matson were kept informed by the Union delegate and the yeoman through the chief steward as to those of the ship's personnel who would not make the next voyage. Some of the complainants were served with charges charging violation of the union constitution while they were off on swing and were thereafter refused assignment slips by the union either because of a union rule which requires that a member against whom charges are lodged remain on shore until the charges are heard and determined or because of suspension from the union following the determination of the charges.

During the period involved the Coast Guard refused for security reasons to permit certain of the men dispatched to a ship to sail. This is referred to as "screening off". Many men who were screened off were later cleared by the Coast Guard. The MC&S adopted a rule under which a man screened off and later cleared was entitled to his old job and the man replacing him was considered to be a relief man, filling the position only until the one whom he relieved had been cleared and dispatched to the job. Both respondent steamship companies knew of this rule. There is evidence that two of the complainants, employees of APL, were screened off and later cleared but when they presented themselves to the hiring hall for assignment slips were denied admittance to the hall and refused slips.

There is creditable evidence that the respondent MC&S, its officers and agents, have, through a regular and planned course of conduct, engaged in acts designed to violate the National Labor Relations Act as alleged in the petition. They have used the hiring hall and the assignment slip requirement in a concerted plan to discourage by intimidation and coercion opposition to its leadership as well as to discourage its members from joining or giving support to NMU. This result has been sought through the means of refusing to give to these dissidents, or by force or intimidation preventing them from obtaining, assignment slips to the jobs to which they were entitled, thus depriving them of their livelihood.

These complainants have the right of self organization, which includes the right to attempt to change the leadership and policies of a union. They have the right to bargain collectively through representatives of their own choosing, to join or not to join a union, to assist a union in furthering its purposes to be substituted for another union as their bargaining representative, and to engage in concerted activities for their mutual aid or protection though no union activity is involved or collective bargaining contemplated [8]. I believe that to give effect to the broad purposes of the Act the activities of the employees here mentioned are within the range of rights which Congress intended to protect.

Knowledge on the part of the employer of unfair labor practices practiced by the union alone is not ordinarily sufficient to charge the employer under the Act, since mere knowledge does not give rise to an inference that the person with such knowledge acquiesces therein for the purpose of either encouraging or discourag-

---

8. Joanna Cotton Mills Co. v. N. L. R. B., 4 Cir., 176 F.2d 749.

ing membership in a labor organization or of interfering with, restraining or coercing employees in the exercise of the rights guaranteed to them by the Act[9]. But the facts and circumstances in addition to such knowledge may be such as to cast a duty upon the employer, the nonperformance of which may well amount to acquiescence and even participation in the unfair labor practice. Here there is creditable evidence that both of the employer respondents knew of the discrimination practiced by the union upon the complainants and that complainants would have been dispatched by the union to jobs to which they were entitled were it not for the discrimination. If, as seems the case here, the employer with knowledge of those facts refuses employment to the employee who has been so discriminated against, the employer acquiesces in and becomes a party to the unfair labor practices which are at the basis of the discrimination. He thereby becomes a party to a conspiracy and is responsible equally with the co-conspirator. I am unable to agree that, if an employee signs off when he is on swing or is unable to sail because of being screened off but later cleared after the sailing, he must always present an assignment slip from the union before he may have reemployment, and that the failure or inability of the employee to present to the employer an assignment slip is a circumstance always protecting the employer from the charges. Attempt seems to be made to absolve these employers from the charges made upon the ground that they were complying strictly with the contract provision which obligates them to accept as employees only such men as are assigned to them by the union. The falacy in this is perspicuous. If there be a showing of unfair practice by the employer the employer may not take shelter under the contract since it is the statute and not the contract which is the measure of the duty and the liability. And what is claimed to be un-

fair practices here is also in violation of the contract.

 It was and is an unfair labor practice for the MC&S to cause or attempt to cause an employer to discriminate against an employee "in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization" or to restrain or coerce employees in the exercise of their right "to form, join, or assist a labor organization or their right to engage in other concerted activities for their mutual aid or protection". The evidence shows reasonable cause to believe that MC&S has engaged in such proscribed practices. It is the discrimination by the union against those in its disfavor, because of the activities the free engagement in which they participated is assured to them by the Act, that affords ample support for the relief here sought. The discrimination is not in the charges or the sentences meted out by the union to these parties; the union was within its rights in prescribing and enforcing nondiscriminatory terms and conditions for acquiring and keeping membership. It may not, however, adopt a rule that requires the discharge of an employee or prevents the reemployment of a member for reasons other than the failure to tender the periodic dues and initiation fee[10]. The crucial question is not the circumstances surrounding the suspension of membership in the union, but rather whether the employee was entitled to the job since the purpose of the statute, as it relates to discriminatory action, was not to favor or promote unions but to promote and protect rights of individual employees to be free from coercion or interference as to union membership or non-membership[11].

 The authority and duty to enjoin the acts here under scrutiny is not subject to the same measure found in the rules applicable in ordinary private controversies[12]. The injunction does not issue as a matter

9. Progressive Mine Workers of America v. N. L. R. B., 7 Cir., 187 F.2d 298; N. L. R. B. v. Fort Worth Transit Co., 5 Cir., 187 F.2d 792.

10. Section 8(b) (2), (a) (3).

11. Union Starch & Refining Co. v. N. L. R. B., 7 Cir., 186 F.2d 1008.

12. Phelps Dodge Corp. v. N. L. R. B., 313 U.S. 177, 61 S.Ct. 845, 85 L.Ed. 1271.

of course. When there is shown a sufficient factual basis, there is in the court a reasonable permissive range of discretion as to whether this relief will or will not be granted [13]. The national policy announced in the statute requires that the remedy fit the violation. Here the evidence indicates many violations over a number of months done under a plan or scheme which resulted in serious loss to these complainants and undoubtedly deterred and intimidated others who may and undoubtedly have been through fear of similar reprisals coerced to refrain from exercising their rights under the Act.

I am persuaded that where there is urgency and the case is clear the injunction may be mandatory in character. Preliminary injunctions of that nature do sometimes issue under equitable principles. And to effect the objects of this statute the power to restore the pre-existing status would seem to be inherent in the vested authority to grant "appropriate temporary relief". As counsel for the Board points out such relief has been granted under this statute [14]. However, if the right to be restored is not clear, the question of restoration should be deferred and finally decided by the Board.

Coercion which went to the extreme of physical force and threats of violence was used by respondent union upon the eight members of the steward's department of the Hawaiian Logger, a vessel belonging to Matson, to force them to leave the ship while it was berthed at Crockett, California. Matson took the position that three men dispatched by the union were entitled to the places of three of the messmen, Paul, Lyle and Kim, upon the ground that these members of the crew had shipped for one voyage and that that voyage had been completed. The evidence is uncertain as to seniority between these men and the men sent by the union, or as to the right to replace a junior by a senior at that port. If the three named messmen did not have seniority they would at least at the end of the then voyage have been subject to replacement by men with seniority. That voyage has since ended. Upon this state of the record there should not be issued a mandatory injunction as to these men. There is here open for determination questions of fact which are in dispute and questions of law which should and undoubtedly will receive careful consideration in the statutory channels. Questions suggest themselves as to whether the other five men were engaged in an economic strike necessitating a request for reinstatement [15], whether they were or were not discharged and, if discharged, was the discharge an unfair labor practice and whether, assuming Matson was not guilty of unfair labor practice, the filling of the jobs with the other employees was within its right. Furthermore, there is nothing before me which indicates that these five would take back their jobs if they were available. Equity does not operate *in vacuo*. The extent of temporary relief to be afforded these eight employees will be within the protection against discrimination which will be a part of the general relief to be ordered herein.

A mandatory injunction requiring restoration of Leslie Boatwright, John Tiernan, Harry Whitelaw, Robert Stewart, Leonard Kralko and James Randall to their former jobs is proper. Charles A. Copeland is entitled to a requirement that MC&S issue an assignment slip to the position he had just prior to the time he was screened off. The evidence discloses that John Chung and Simon Lubin have been restored to their positions. There appears no need of specific relief as to them.

Other questions raised before the Board and at the trial of this case have been presented. They have been considered. I see no value in discussion of them here. It will suffice to say that I am generally in accord with petitioner's views upon them.

Findings of fact and conclusions of law will be prepared, served and lodged by petitioner.

13. United Broth. of Carpenters etc. v. Sperry, 10 Cir., 170 F.2d 863.

14. Madden v. International Union United Mine Workers, D.C., 79 F.Supp. 616; Penello v. United Mine Workers, D.C., 88 F.Supp. 935.

15. N. L. R. B. v. Sunshine Mining Co., 9 Cir., 110 F.2d 780.