John J. A. **REYNOLDS**, Jr., Regional Director of the Twenty-sixth Region of the National Labor Relations Board, for and on Behalf of the **NATIONAL LABOR RELATIONS BOARD**

v.

**CURLEY PRINTING COMPANY**, Inc.

Civ. No. 4229.

United States District Court
M. D. Tennessee,

Nashville Division.

Nov. 9, 1965.

Henry L. Jalette and Herbert I. Meyer, N.L.R.B., Memphis, Tenn., for plaintiff.

Wilson Sims and Russell F. Morris, Jr., Bass, Berry & Sims, Nashville, Tenn., for defendant.

GRAY, District Judge.

This proceeding is brought on behalf of the National Labor Relations Board pursuant to Section 10(j) of the National Labor Relations Act, 29 U.S.C. § 160(j), to obtain a temporary injunction against the respondent, Curley Printing Company, Inc., pending final disposition by the Board of unfair labor practice charges brought by Printing Pressman Local 37, International Printing Pressmen and Assistants' Union of North America, AFL–CIO, (hereinafter called Pressmen), and Nashville Bookbinders Local 83, International Brotherhood of Bookbinders, AFL–CIO, (hereinafter called Bookbinders). These labor organizations filed charges with the Board alleging that respondent has engaged in, and is engaged in, unfair labor practices in violation of Section 8 (a)(1), (3) and (5) of the Act. Pursuant to these charges complaints were issued and a hearing was conducted before a Trial Examiner. Immediately after this hearing was concluded and before the Trial Examiner had reported his determination of the issues, the Board instituted this proceeding to obtain a temporary injunction. The parties stipulated that the facts are correctly set out in the record of the Trial Examiner's hearing.

Although, in considering whether a temporary injunction should issue, this court has examined the same evidence from which the Trial Examiner is to determine whether respondent has committed unfair labor practices, the scope of this court's review differs from that of the Trial Examiner. Section 10(j) provides:

"The Board shall have power, upon issuance of a complaint as provided in subsection (b) of this section charging that any person has engaged in or is engaging in an unfair labor practice, to petition any district court of the United States (including the District Court of the United States for the District of Columbia), within any district wherein the unfair labor practice in question is alleged to have occurred or wherein such person resides or transacts business, for appropriate temporary relief or restraining order. Upon the filing of any such petition the court shall cause notice thereof to be served upon such person, and thereupon shall have jurisdiction to grant to the Board such

temporary relief or restraining order as it deems just and proper."

This court's review is limited to a determination of whether reasonable cause exists to believe that respondent has committed unfair labor practices and whether injunctive relief is "just and proper." Whether unfair labor practices were in fact committed is exclusively within the determination of the Board, subject to review by the Court of Appeals.

The record shows that respondent operates a commercial printing plant in Nashville, Tennessee. In April of 1965, Pressmen began a campaign to organize respondent's pressroom employees, and Bookbinders began a campaign to organize respondent's bindery, shipping, mailing and stockroom employees. By the end of April, Bookbinders had obtained signed authorization cards from a number of respondent's employees. Accordingly, Bookbinders notified respondent that it represented a majority of its employees in the bargaining unit and demanded that respondent recognize its status and bargain with it. Upon rejection of this demand, Bookbinders petitioned the Board to conduct an election among the bindery, shipping, mailing and stockroom employees. An election was conducted on June 11, 1965, and the results were 24 votes for Bookbinders, 17 against and 5 challenges. Bookbinders was certified as bargaining representative on June 21.

Unionization was bitterly opposed by the management of the respondent. Whether there is reasonable cause to believe that this opposition spawned unfair labor practices and, if so, whether a temporary injunction is "just and proper" pending final determination by the Board are the issues before the court. It is necessary to examine separately each of the alleged unfair labor practices to which these issues relate.

Petitioner asserts that immediately after the election respondent changed the shifts of bindery employees in retaliation for the union victory. On June 11, 1965, two hours after the ballots were tabulated, respondent notified the female night shift bindery employees that they would begin to work the day shift on Monday, June 14. On Monday and Tuesday all of the female bindery employees worked on the day shift but on Wednesday June 16, 1965, when the regular day shift bindery female employees reported for work they were told to go home until 4:00 p. m. when they were to report back to begin working on the night shift. The record indicates that this wholesale shift change, the first such shift change in the plant's history, seriously disrupted the employees' schedules and home lives. One employee, Mary Smith, was forced to terminate her employment because of the hardship created by the shift change. Respondent's officers testified that the shift changes were motivated by reports of drinking on the night shift, the need to place the best workers on the night shift because of lack of supervision at night, and the prospect of discontinuing the night shift. Whether these reasons actually motivated the shift change is an issue exclusively within the Board's determination. This court finds that the proximity in time of the shift change to the election, the fact that the change was instituted unilaterally without notice to the union, the lack of precedent for the change in the Company's history, and the employee hardship which respondent had reason to know would result, constitute reasonable cause to believe that the shift change was instituted as a reprisal against the employees and as an attempt to undermine the union's support. Although respondent has recently returned the employees to their pre-election shifts, this action was taken only after application for temporary injunction had been made, and the court is of the opinion that injunctive relief is "just and proper" to prevent respondent from making further shift changes during the pendency of the proceedings before the Board.

It is further asserted that respondent committed an unfair labor practice by laying off regular bindery employees and subcontracting work ordinarily performed by them for purposes of reprisal.

Prior to the June 11, 1965 election, respondent had never laid off a group of regular employees. Shortly before the election, however, respondent's general manager notified the employees by letter that if the union won the election layoffs might result. In this letter to the employees dated May 29, 1965, he stated:

"No union can give you job security! At times our work load has been slack, but fortunately we did not lay off anyone. We tried, with your cooperation, to find work for everyone. If you had a union, it is very possible to have a situation where individuals would be laid off for lack of work.

" * * *

" * * * You should seriously question the need for any outside group, in the form of a union, who threaten to strip you of your individuality and some of your job security."

On June 30, 1965, and August 9, 1965, the predicted layoffs materialized. Four of the eight employees who were laid off on those dates have not been recalled. The reason given by respondent for the layoffs was lack of work. The bindery workers, however, testified that at the time of the layoffs an unusually large amount of work was piled on skids waiting to be processed. One employee testified that respondent's foreman denied her request for a vacation during the first week of July because of the amount of work to be done in the bindery. Moreover, respondent's monthly sales figures show that the volume of sales during June and August, 1965, was exceeded only in three months during the preceding five years. The record also shows that bindery work was subcontracted to other companies. It was testified that much of this work could not be performed by respondent's employees because of the lack of specialized equipment. Respondent's general manager admitted, however, that at least one of the jobs subcontracted was work which the unit employees were capable of doing and had done in the past. He stated that the reason for subcontracting this job was that it was less costly to do so than to have respondent's own bindery employees perform the work.

Upon consideration, the court is of the opinion that the threats of layoffs in the event of a union election victory, the unilateral nature of the layoffs, the testimony of the employees concerning the amount of work to be done corroborated by respondent's sales figures, and the admission that work ordinarily done by respondent's unit employees was subcontracted, constitute reasonable cause to believe that the layoffs were reprisals against the employees for their selection of the union as their bargaining representative.

It is further asserted that respondent, on Monday, June 14, 1965, as a reprisal for the union victory, harassed three bindery employees by requiring them to perform work that they had never before performed and by timing their attempts. On that date, Joyce Jacobs, Waldine Staggs and Opal Davis were instructed by the bindery foreman, Robert Douglas, to "set up" and begin operating machines that they had never previously "set up." When they requested the foreman to instruct them in how to perform the "setup," he refused, and when the employees finally completed the task on their own, the time that it had taken them to do so was recorded. The employees had never before been requested to "set up" the machines nor had they been previously timed in any of their work.

The full significance of the foreman's order to "set up" the machines and his timing of that operation is perhaps revealed by Joyce Jacobs' undenied testimony concerning a conversation that she had with Robert Douglas prior to the election in which he attempted to persuade her to vote against the union. She testified as follows:

"He [Robert Douglas] said that Doug couldn't set up the machine. He said, 'If I told him to set up a

machine he couldn't do it, and I could fire him.'

"He was at the punching machine showing me then, and I said, 'You mean if I couldn't set this machine up and you told me to you could fire me.'

"He said, 'Yes,' he could."

There is reasonable cause to believe that the acts of the foreman in regard to his order to "set up" the machines were acts of reprisal for the union victory and were intended to show the employees that the union could not protect the employees from loss of their jobs or from deterioration of working conditions.

Petitioner also asserts that there is reasonable cause to believe that respondent has committed, and is continuing to commit, an unfair labor practice by refusing to bargain with the certified union in good faith. The record shows that respondent met with union representatives on July 8, July 15, July 22, July 29, and August 31. The union requested additional meetings but respondent refused to meet on other dates because of other business commitments. At each of the meetings, the union requested that respondent furnish it with a list of the unit employees showing the date each employee was hired and their current wage scale. At each meeting respondent refused to furnish the list. Although the union and respondent were able to reach agreement on locking the plant's back door at night and on oiling of machines, respondent absolutely refused to bargain with the union about shift changes and layoffs. At the time of the hearing before the Trial Examiner, the bargaining had not progressed beyond the discussion of preliminary matters to the issues of wages and working hours.

The court appreciates the fact that the bitterly contested union representation campaign followed by the filing of charges of unfair labor practices has created an atmosphere in which good faith bargaining is difficult.[1] Nevertheless, the Act places upon respondent the duty of bargaining in good faith. The record shows that respondent has met with the union and has made minor changes in working conditions as a result of this bargaining. But the record also discloses that respondent effected major adverse changes in the employees' working conditions unilaterally although the law requires bargaining on such changes,[2] and that the major economic issues remain undiscussed. Upon consideration of the evidence, the court is of the opinion that there is reasonable cause to believe that respondent has refused to bargain with the union in good faith.

Petitioner further asserts that respondent is guilty of an unfair labor practice in discharging three employees because of their union activities. These discharged employees are Robert Proper, Clarence Nail and Garner Norfleet.

Robert Proper was hired by respondent on May 1, 1965, as a paper cutting machine operator in the bindery. He obtained his employment through intercession of his mother-in-law, Melrose Johnson, who was employed in the bindery and who became an outspoken union supporter. On May 29, Proper attended a union meeting and at the request of Mrs. Johnson he signed a union authorization card. On Monday, May 31, foreman Robert Douglas discharged Proper when he reported for work. The discharge came without warning. The reason for the discharge given by the respondent was that Proper's work was unsatisfactory. The two men responsible for training Proper in the operation of the cutting machine, however, both testified that Proper was doing unusually

1. Respondent's attitude toward bargaining with the union is illustrated by the undenied testimony that immediately after the tabulation of the ballots, respondent's president, Julius Curley, inquired in the presence of employees whether he could close down the plant rather than bargain with the union.

2. National Labor Relations Board v. Katz, 369 U.S. 736, 82 S.Ct. 1107, 8 L.Ed.2d 230 (1962).

well considering his experience. Moreover, according to the testimony of one of these instructors, foreman Robert Douglas, who purportedly made the decision to discharge Proper, had stated on May 28 that Proper was doing "a real good job." Mrs. Johnson likewise testified that she had heard Douglas express his satisfaction with the work Proper was doing.

Clarence Nail was employed by respondent as a cutting machine operator from 1958 until 1963 when he terminated his employment to accept a job as foreman at the Tennessee Preparatory School (TPS). In September, 1964, Nail began "moonlighting" as a cutting machine operator in respondent's plant on a part-time basis. Although Nail reported to work only when he was notified by respondent's bindery foreman that he was needed, his time sheets reveal that he was needed often enough to consistently compile 25 to 45 hours of work each month.

Nail was a member of the Bookbinders' Union and an instigator of union activity in respondent's plant. He testified that, on the afternoon of the election, he was called into the office of the plant superintendent, Gilbert Douglas, who asked him whether he was a union member, and that when he replied affirmatively, Douglas discharged him. Douglas testified that he asked Nail whether he was a union member because he had noticed Nail's interest in the election outcome even though Nail was not eligible to vote. He testified that, after Nail stated that he was a union member, he told him to pick up his check and to leave the plant. He testified, however, that Nail had not been discharged but that since the election he had not been needed and that if he were needed in the future, he would probably be contacted.

Garner Norfleet had been employed by respondent as a pressman for five years prior to his discharge on May 11, 1965. Norfleet testified that, at the time of his hiring, he informed respondent's vice-president, John Curley, that he was a member of the Pressmen's Union. According to Norfleet's undenied testimony, Curley stated that it was all right for him to carry a union card as long as he "kept [his] nose clean and didn't stir up any union activity in the shop." In early April, 1965, Norfleet began "stirring up" union activity although his own union membership had previously lapsed because of failure to pay his dues. At the request of the Pressmen's Union and the Bookbinders' Union, Norfleet obtained a list of all of respondent's employees by copying their names from their time cards. The list was completed on April 21, 1965, and was given to the unions. Norfleet testified that he did not believe anyone observed him preparing the lists. During the first week in May, Norfleet obtained blank union authorization cards and talked to four pressmen about signing them. On Saturday, May 8, 1965, Norfleet himself signed an authorization card and delivered it to a union representative at another printing plant. On May 11, Norfleet was discharged. Respondent's pressroom foreman, Robert Jones, testified that Norfleet's production was below that of the two other men who operated the same press and that because of this he had decided some six months prior to May, 1965, to discharge Norfleet. He testified that he had delayed discharging him because he had been unable to find an experienced replacement. The record shows that no replacement was put on the press until Friday, May 14, when an employee was transferred to the press from another department. Norfleet admitted that his production was slightly under that of the other two operators of the press.

Employee Joyce Jacobs testified that, on May 22, 1965, foreman Robert Douglas, while attempting to persuade her to vote against the union, made reference to the reason for Norfleet's discharge. She testified:

"So, he [Robert Douglas] started telling me what he thought was bad [about the union], and he said, 'It's just like this Norfleet over here.'

He said, 'He was talking about the union and they fired him.' He said, 'All they had to say was, "Unsatisfactory work," but it was because he was talking about the union.' "

Concerning statements made by Robert Douglas, respondent's counsel stated to the Trial Examiner as follows:

"Robert Douglas is supposed to have asked people how they felt about the union, and whether they were going to vote for the union or against the union.

"I have talked to Robert Douglas and he told me that he did those things. So, I want to state to Your Honor that I haven't left * * * his testimony out of the record inadvertently, but we felt that * * since Mr. Douglas says that he did ask some of them how they felt about the union, and that sort of thing, that I should make the statement that I make now."

Upon consideration, the court finds that there is reasonable cause to believe that Robert Proper, Clarence Nail, and Garner Norfleet were discharged by the respondent because of their union activity.

The court has found reasonable cause to believe that respondent has engaged in, and is continuing to engage in, a pattern of illegal activity in flagrant violation of the provisions of the Act. The court is of the opinion that unless this activity is restrained, it may, prior to the ultimate adjudication of the controversy, irreparably dissipate support for the union among the bindery employees and also intimidate the employees in the pressroom in regard to the union representation campaign currently being conducted in that department. Moreover, the court is of the opinion that this relief should include compelling respondent to bargain in good faith and to reinstate the employees who were discharged, laid off, or forced to quit work because of the shift change. While it is apparently true that the Board has only rarely applied for a mandatory temporary injunction under Section 10(j), affirmative relief has on occasion been granted. Brown v. National Union of Marine Cooks and Stewards, D.C., 104 F.Supp. 685 (1951) [requiring reinstatement];[3] Madden v. International Union, United Mine Workers of America, D.C., 79 F. Supp. 616 (1948) [requiring bargaining]. Moreover, the language of Section 10(j) places no limitation on the scope of the temporary injunctive relief that may be granted other than the limitation that the relief must be "appropriate" and "just and proper."

In determining whether temporary reinstatement is "just and proper," the court has considered the hardship that compelling reinstatement may cause respondent should the issues be ultimately determined in its favor. The court is persuaded, however, that this consideration is outweighed in this case. The evidence indicates that respondent, through letters and statements of its officers and foremen, repeatedly warned the employees that unionization would impair their job security. The continued absence of the eight employees can only give credence to these warnings. Even-

---

3. The court stated in this case as follows: "I am persuaded that where there is urgency and the case is clear the injunction may be mandatory in character. Preliminary injunctions of that nature do sometimes issue under equitable principles. And to effect the objects of this statute the power to restore the pre-existing status would seem to be inherent in the vested authority to grant 'appropriate temporary relief'. As counsel for the Board points out such relief has been granted under this statute. However, if the right to be restored is not clear, the question of restoration should be deferred and finally decide by the Board." (104 F.Supp. at page 691)

This court is of the opinion, however, that while clarity of the evidence is a factor to be considered in determining whether restoration is "just and proper," the District Court cannot find that the evidence clearly establishes an unfair labor practice without invading the sphere of determination exclusively granted to the Board.

tual reinstatement, if it is ultimately determined that the eight employees are entitled to reinstatement, may come only after the silent intimidation of their absence has undermined the union representation campaign currently being conducted in the pressroom, and dissipated the union support among the bindery employees. In this event, eventual reinstatement would come too late to prevent respondent from obtaining its objectives by unfair labor practices.

Accordingly, the court is of the opinion that there is reasonable cause to believe that respondent has engaged in unfair labor practices in regard to discharge of employees, shift changes, harassment of employees, layoffs, subcontracting of work and refusal to bargain in good faith with the Bookbinders' Union and that respondent should be enjoined, pending final adjudication of the matter, from continuing to engage in these practices. The court is also of the opinion that respondent should be compelled, pending final adjudication, to bargain with the Bookbinders' Union in good faith with an intention of entering into a final and binding collective bargaining agreement, and to offer to Garner Norfleet, Robert Proper, Mary Smith, Izetta Thomas, Barbara Beasley, Bertha Hickman and Katherine Manners, immediate and full reinstatement to their former or substantially equivalent positions.

The order of reinstatement should not, however, extend to Clarence Nail in light of the fact that Nail is a full-time employee of the Tennessee Preparatory School and that his stated purpose in working part-time for respondent was to encourage unionization among the bindery employees. The court is convinced that to require respondent to reinstate Nail on the indefinite basis of his previous employment would be a possible source of continued litigation and would be unwise in the absence of the urgency that might exist if Nail were unemployed.

An order will be submitted consistent with this opinion.